FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT, E.D.N.Y.
LONG ISLAND OFFICE

★ APR 0 2 1997 ★

ENTERED
★ 4-3-97 ★

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

-------------------------------X

**ALAN B. AMRON   Pro Se**

        **Plaintiff,**

  **-against-**

**AZRAK-HAMWAY INTERNATIONAL a/k/a
REMCO TOYS and K-MART STORES, INC.
and WARNER BROTHERS CONSUMER PRODUCTS
DIVISION a/k/a JONNY QUEST**

        **Defendants.**
-------------------------------X

**CIVIL ACTION NO.**

**CV-97**

**JURY TRIAL DEMANDED**

PLATT, J.

## COMPLAINT
### JURISDICTION AND VENUE

**1.**   This is an action brought for the purpose of determining an actual controversy under the patent laws of the United States, Title 35 U.S.C. section 271.  Venue in this district is proper under 28 U.S.C. Section 1391 and 1400 (b).

**2.**   The jurisdiction for this case is based upon a Federal question, pursuant to 1128 U.S.C Section 1338.

### PARTIES

**3.**   Plaintiff, Alan B. Amron (hereinafter referred to as **"Amron"**), is an individual residing at 77 Horton Place, Syosset New York 11791.

**4.**   Defendant, Azrak-Hamway International a/k/a Remco Toys (hereinafter referred to as **"REMCO"**), is a New York Corporation having it's principle place of business at 1107 Broadway Suite #808 New York, New York 10010-2894.  Remco has shipped its toy products into this district.

**5.** Defendant, K-Mart Stores (hereinafter referred to as **"K-MART"**), is a Corporation having a retail place of business at 3350 Hempstead Turnpike in Levitown New York 11756.

**6.** Defendant, Warner Brothers Consumer Products Division of Warner Communications Inc. (hereinafter referred to as **("Warner Bros.")** is a corporation having a principle place of business at 1325 Avenue the of Americas in New York 10019.

**7.** "Amron" has developed, designed and patented a wide variety of children's toys, and games, for licensing such toys to the toy industry. Among other inventions which Amron had been assigned and which he had developed are a number of battery and air pressurized continuous stream water guns. (see Exhibit #1)

**8.** Defendants, "Remco, K-Mart and Warner Bros." have benefited directly from the sale, manufacturing and distribution of an air pressurized water gun toy (model #16144 see Exhibit #10) which infringes on one or more of the claims in Amron's assigned United States Patent Number 4,239,129. (see Exhibit #2). Amron is the owner of Patent Number 4,239,129.

**9.** Defendants, "Remco, K-Mart and Warner Bros." have been notified in writing of the fact that Amron believes they are infringing on one or more of the claims in United States Patent Number 4,239,129; but Amron has received no substantive response. (see Exhibits #3, #4, #5 and #14)

**10.**   Upon information and belief, the defendant, "Remco" has intentionally removed Amron's United States Patent notice of U.S. Patent 4,239,129 from both the product itself and it's packaging, to avoid from having to continue to pay royalty on these products.   Previously it displayed that patent notice on the relevant toy guns.   (see Exhibit #11)

**11.**   Upon information and belief, the defendant, "K-Mart" is selling, and substantially profiting from sales of the infringing products.   (see Exhibit #6).

### BACKGROUND

**12.**   In 1973 Amron invented, and patented, (U.S. Patent No. 4,022,350) the very first battery operated water gun toy, which thereafter changed the pricing structure in the entire water gun industry.   (see Exhibit #7)

**13.**   As a result of the commercial success of Amron's battery operated water guns in 1986, and the development and licensing of other air pressurized water guns in 1990, the Defendant, "Remco"  set out on a course of conduct to fulfill their need to develop bigger and better water guns than the "Amron" battery gun, in view of competitive pressure.

### COUNT I -- INFRINGEMENT OF PATENT NUMBER 4,239,129

**14.**   Plaintiff incorporates the averment of paragraphs 1 through 13 as if fully restated herein.

**15.**   Defendants have intentionally and willfully and directly infringed Patent Number 4,239,129 by making and selling toy guns which infringe the claims of that patent.

**16.**   Under the doctrine of license estoppel, Remco can not deny its infringement of Patent Number 4,239,129.

**17.**   Amron has been damaged by defendant's acts of infringement.  The infringement of defendants, "Remco", "K-Mart" and "Warner Bros." was deliberate and malicious, with a bad motive and with reckless indifference to Amron and was without any justification.

Such infringement by defendants was without Amron's consent and with full knowledge by them of Amron's rights under Patent Number 4,239,129.

## PRAYERS FOR RELIEF

**WHEREFORE,**  Plaintiff demands judgement against the defendants, "Remco", "K-Mart" and "Warner Bros.":

**A.**   That the defendants' air pressurized toy guns infringe on the assigned United States Patent number 4,239,129,  and all royalties due, past due and future are to be paid directly to Amron.

**B.**   That judgement be entered for compensatory damages in favor of the Plaintiff and against the defendants, both jointly and severally, for no less than **TWO MILLION DOLLARS.**

**C.**   That a judgement be entered for punitive damages in

favor of the plaintiff and against the defendants, both jointly and severally, for no less than **ONE MILLION DOLLARS.**

**D.** That judgement be entered in favor of the plaintiff and against the defendants, both jointly and severally, for treble damages in a sum of no less than **NINE MILLION DOLLARS.**

**E.** That judgement be entered in favor of the plaintiff and against the defendants, both jointly and severally, for out of pocket expenses and costs relating to this case in the sum of **FIFTY THOUSAND DOLLARS.**

**F.** That future manufacture and sales of infringing toy guns be enjoined by a preliminary and a permanent injunction.

**G.** That the court order such other and further relief as may be deemed by the Court to be just and proper under the circumstances.

**ALAN AMRON    Plaintiff Pro Se**
77 Horton Place
Syosset, New York   11791

(516) 692-2830 Phone
(516) 364-0238 Fax


**Defendants,**

Mr. Marvin Azrak
**Azrak-Hamway International**
1107 Broadway

Suite #808
New York, New York 10010

(212) 675-3427 Phone
(212) 243-4271 Fax

and

Mr. Ryan Shea
**K-Mart Store #3979**
3350 Hempstead Turnpike
Levitown, New York 11756

(516) 579-0750 Phone
(516) 579-1475 Fax

and

Ms. Karen McTier
**Warner Brothers Consumer Products Division**
of Warner Communications a/k/a Jonny Quest
1325 Avenue of the Americas
New York, New York 10019

(212) 636-5600 Phone
(212) 636-5601 Fax

## Exhibit list to support the attached complaint

1. List and pictures of Amron water toys, for background.

2. Esposito United States Patent Number 4,239,129 being infringed.

3. February 17, 1997 first letter to Remco with assignment attached requesting a cure to breech of agreement.

4. Letter from Paul Eisenstein, Esq. warning of Breech dated March 5, 1997.

5. Final letter cease and desist dated March 19, 1997.

6. Picture infringing product purchased from K-Mart, the package and Gun.

7. Alan Amron United States Patent # 4,022,350, for background.

8. Breached license agreement for the One Pump/Amron.

9. Breached licence agreement for the Esposito U.S. Patent #4,239,129.

10. Color chart showing infringement comparisons from Amron assigned Patent 4,239,129 to infringing Remco product.

11. Back of Remco package showing previously imprinted notice of the Esposito United States Patent #4,239,129 and Amron names right on it.

12. The K-Mart register receipt from the purchase of the infringed product.

13. Remco's original line of air pressurized water guns that all had imprinted on the back and on the products themselves, Esposito Patent #4,239,129 and Amron Patent Pending ONE PUMP.

14. Letter dated March 19, 1997 from Paul Eisenstein, Esq. to Remco's patent counsel Jesse Rothstein, Esq., again sending a copy of the Amron TTMP assignment.

1

# My Association with Water Hits Every Year Is No Accident!

© Alan Amron 1996

1995 thru 1996
Shout N' Shoot & Shout N' Shoot II The first ever Voice Activated
battery operated water shooters by:   CAP TOY




1994 thru 1996
The Python Snake, The first ever Remote control battery operated
water shooter on a remote control car by:   TYCO TOYS



1993 thru 1996
Air pressurized, no batteries required, water guns "One Pump"
& "Double Pump" by:   REMCO TOYS   &   ARCO/MATTEL TOYS




1992 thru 1996
"Robo Blaster" The first ever battery operated wrist water shooter
by:   CAP TOY



1991 thru 1994
"Bubbles N' Burst" The first ever battery operated bubbles maker
& water gun combination by:   PLAYTIME/TYCO TOYS



1990 thru 1995
The "Rad Soaker",  "Drencher" line of the first ever continuous
stream battery operated water guns by:   BLUE BOX TOYS




1984 thru 1994
The first ever Pulsating battery operated water guns by:
Larami Toys     Empire of Carolina Toys     Buddy L Toys     LJN/Entertech Toys     Playtime/Tyco Toys






**2**

12/16/80    AK    44239129
Case 9:97-cv-01591-TCP-MLO   Document 1   Filed 04/02/97   Page 11 of 92 PageID #: 11

# United States Patent [19]

**Esposito**

[11] **4,239,129**

[45] **Dec. 16, 1980**

[54] **WATER PISTOL AND/OR FLASHLIGHT STRUCTURE**

[76] Inventor: **Gary F. Esposito**, 5862 Lexington Ave., Portage, Ind. 46368

[21] Appl. No.: **964,680**

[22] Filed: **Nov. 29, 1978**

[51] Int. Cl.³ .............................................. **F41B 9/00**
[52] U.S. Cl. ...................................... **222/79; 362/112**
[58] Field of Search .............. 222/79, 113; 273/84 R; 362/112, 109, 113

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,536,484 | 1/1951 | Avery | 362/112 |
| 2,629,516 | 2/1953 | Badham | 222/79 |
| 2,648,159 | 8/1953 | Rotfeld | 362/112 X |
| 2,660,000 | 11/1953 | Strayer | 362/112 X |
| 3,240,924 | 3/1966 | Darby | 362/112 |
| 3,365,838 | 1/1968 | Butler | 222/79 X |
| 3,578,789 | 5/1971 | Ferri | 222/79 |

*Primary Examiner*—Stanley H. Tollberg
*Attorney, Agent, or Firm*—Charles S. Penfold

[57] **ABSTRACT**

The subject invention involves a toy water pistol which embodies improvements with respect to a reciprocal pump therefor for building up pressure against a liquid for ejecting a stream thereof forwardly through a nozzle an appreciable distance; valve means for controlling the flow of the liquid; a source of electricity; light responsive means and lamps therefor for constituting means for illuminating the stream; a buzzer and a switch for controlling the operation of the lamp and buzzer; and a trigger for simultaneously operating the valve means and switch.

**35 Claims, 12 Drawing Figures**



Case 9:97-cv-01591-TCP-MLO   Document 1   Filed 04/02/97   Page 12 of 92 PageID #: 12



FIG.2

FIG.1

FIG.3

FIG.4

FIG 8

FIG.9

Copy provided by PTCS from the PTO APS Image Data Base on   11/29/...

Case 9:97-cv-01591-TCP-MLO   Document 1   Filed 04/02/97   Page 13 of 92 PageID #: 13



FIG. 5

FIG.6

FIG. 7

Case 9:97-cv-01591-TCP-MLO   Document 1   Filed 04/02/97   Page 14 of 92 PageID #: 14



FIG. 10

FIG. 12

FIG. 11

Copy provided by PTCS from the PTO APS Image Data Base on   11/29/1996

4,239,129

**1**

## WATER PISTOL AND/OR FLASHLIGHT STRUCTURE

### BACKGROUND OF THE INVENTION

Children of all ages, especially boys, through the 5 years have exhibited a fascination for water, lights and noise and the subject invention deals with these factors embodied in a toy simulating a pistol.

An appreciable number of U.S. patents have issued which are directed to water pistols but none appear to 10 disclose a unique assembly of components which can be utilized to simultaneously produce a jet or stream of water, means for illuminating the stream and a noise, or if so desired, one which can be operated without employing the noise and the stream illuminating means. A 15 reciprocable pump is employed to obtain sufficient pressure whereby the pistol can eject a stream an appreciable distance in the neighborhood of thirty feet and this stream can be illuminated to more or less simulate a lazer beam. 20

### OBJECTIVES OF THE INVENTION

In view of the foregoing, and more particularly, one of the important objects of the subject invention is to provide a toy which comprises wall structure forming an elongated barrel having appreciable cross-sectional 25 dimensions and a chamber for containing a supply of water and an offset forming a hollow handle for housing or supporting a source of electricity, such as one or more batteries, valve means, a switch, and a trigger for controlling the operation of the valve means and the 30 switch.

A significant objective of the invention is to provide a unique organization of components which offers a setup whereby certain of the components or subassemblies of the toy or structure can be selectively operated 35 and/or installed. For example, the pistol may be utilized solely for expelling or projecting a stream of water, in which event, the electrical system is rendered inoperative, or conversely the electrical system may be rendered operative to the exclusion of the water system. 40

A particular object of the invention is to provide the barrel structure of the toy or device with subassemblies at its front and rear extremities, each subassembly preferably including a colored lens or light responsive means, a lamp backed by a reflector, and a support or 45 mounting therefor the subassembly at the front extremity serving to provide a forward beam of colored light throughout substantially the full length of the stream of water ejected, which as stated above may be projected an appreciable distance in the neighborhood of thirty 50 feet.

A specific but very important object is to provide the barrel with a pumping system which comprises an elongated tank, an elongated cylinder disposed axially in the tank and a piston or plunger mounted in the cylinder for 55 manual operation to force air into the tank for expelling the water therefrom and out through a nozzle at the front extremity. The cylinder is provided with a conventional check valve. The tank is provided with a refill protuberance extending through an upper wall portion 60 of the barrel and certain of the subassemblies, above referred to, are respectively disposed adjacent the extremities of the barrel and are designed to conform to shapes of the barrel structure.

Another object of the invention is to provide the rear 65 extremity of the barrel with a buzzer or noise producing device and the hollow handle with a lower space or compartment for housing one or more batteries, as gen-

**2**

erally referred to above, an upper area for accommodating the valve means and switch, and a support for the trigger.

A particularly significant objective is to provide a unique control assembly or system for simultaneously controlling the operation of the valve means, switch, and noise producing unit.

A specific object is to provide an improved nozzle which offers an infinite range of manual adjustments, within practicable limits, for directing a stream of liquid where desired.

A further specific object is to provide means whereby the piston rod of the pump may be detachably locked or held in a forward inoperative position for safety purposes.

Other objectives reside in providing a water pistol which is safe for use by everyone, durable, readily manipulable, offers advantages with respect to assembly and disassembly, and is efficient in operation.

Additional objects and advantages of the invention will become apparent after the description hereinafter set forth is considered in conjunction with the drawings annexed hereto.

### DRAWINGS

FIG. 1 is a side view of the toy embodying the subject invention;

FIG. 2 is a front elevational view of the toy;

FIG. 3 is a top view of the toy;

FIG. 4 is a rear elevational view of the toy;

FIG. 5 is a horizontal section depicting the operative relationship of the various subassemblies or components of the toy;

FIG. 6 is a diagram of the electrical circutry employed;

FIG. 7 is an enlarged horizontal section of a valve assembly and switch structure;

FIG. 8 is an enlarged sectional view of a check valve utilized in the pumping system;

FIG. 9 is an enlarged vertical section of a nozzle assembly;

FIG. 10 is an enlarged partial section showing the mode of mounting a reflector and lens at the front extremity of the toy;

FIG. 11 is an enlarged partial section depicting a mode of detachably locking a piston rod of the pump in a forward inoperative position; and

FIG. 12 is an enlarged sectional view showing a modified arrangement of batteries constituting the electrical source of energy.

### DESCRIPTION

Referring to the drawings, and particulary to FIG. 5, the device or toy includes, among other things, wall structure forming an elongated barrel generally designated 1 and a chamber or tank 2 for liquid within the confines of the barrel, a pump generally designated 3 in the tank, for applying pressure to the liquid, for ejecting a jet stream of water through a nozzle 4 and a hollow handle 5 disposed intermediate the extremities of the barrel for containing a valve means generally designated 6, a switch 7 carried by the tank and a source of electricity preferably comprising a pair of batteries 8. The toy or device also includes a lamp 9 and a light responsive means 10 located at the front extremity of the barrel, a lamp 11, light responsive means or lens 12 and a buzzer 13 at its rear extremity and a trigger 14 for

**3**

controlling the operation of the valve means 6 and the switch 7.

The barrel 1 is preferably constructed of a durable molded plastic material having variable cross-sectional dimensions so that it is generally in the form of a tapered cylinder and its front and rear extremities are respectively provided with subassemblies having fittings or end supports or mountings 15 and 16, also of plastic, which are preferably press fitted or otherwise telescopically and detachably secured in or to the extremities of the barrel for supporting the lamps, light responsive means and buzzer.

The tank 2 located in the barrel and its associated parts will now be described. This tank is preferably in the form of an elongated cylinder and it has a tubular externally threaded protuberance or offset 17 which extends upwardly through an opening 18 provided therefor in the barrel and a cap 19 is threadedly connected to the offset for sealing the tank after it is filled with a liquid such as water. The tank may include a press fitted rear end wall 20 having an opening therein through which the rear end of a cylinder 3' of the pump 3 extends into the mounting 16 and the front end of this cylinder is provided with a conventional check valve assembly 21. This assembly shown in FIG. 8 includes a ball 22 and a vent 22'. The pump includes a piston 23 having a rod 24 which extends through a fixed tubular bearing 70 of the cylinder and through the light responsive means 12 and carries a handle 26 whereby to facilitate reciprocation of the rod and piston to force air into the tank through the check valve assembly 21 and build up pressure sufficient to expel water therefrom and to and through the nozzle 4 an appreciable distance of approximately thirty feet as stated above.

The front end of the cylinder 3' is provided with a projection which fits into a recess provided therefor in the front end wall of the tank 2 as clearly shown in FIG. 5. The rear end of the cylinder is closed by the tubular bearing 70 which has a radial flange 71 engaging an inner surface of the lens 12 and a cylindrical portion 40 which extends through an opening in this lens. The cylinder is also provided with an annular bead 72 which engages the end wall 20 of the tank. This structure serves to support the cylinder in a practical way.

The valve means generally designated 6 constitutes a subassembly and is preferably housed in and fixedly secured in the hollow handle 5. It may be designed and constructed in various ways but as best shown in FIG. 7 it preferably includes a relatively small cylindrical casing 27 in which is disposed a front tubular end bearing 28, a shaft 29 slidable therein and which constitutes a component of the trigger 14. The casing is provided with an internal resilient ring, gasket or washer 30 which engages an end of an internal fixed tubular sleeve or abutment 30' which carries the bearing 28. The shaft 29 has an enlargement 31 provided with an angled member 32 having an offset finger for causing a resiliently flexible contact 33 to engage an adjacent fixed contact 34 of the switch 7. The lower portion of the member 32 is preferably non-circular in cross-section and fits into the enlargement 31 so as to fixedly secure the member to the shaft. An angular guide or element 74 has a fixed portion extending into the casing 27 and sleeve 30' and guiding surfaces 75 for the member 32. A second shaft 37' is provided with a resilient annular valve 35 which is normally held against the gasket 30 by a helical spring 36 which encircles this shaft and is interposed between the valve 35 and an end wall of the casing 27. The shaft

**4**

29 carries a resilient frusto-conical seal 36' which slidably engages the internal cylindrical surface of the sleeve 30' whereby to prevent back flow of water outwardly through the bearing 28 and through the member 74. The seal 36' is firmly held against the enlargement 31 by a member 37 secured to the second shaft 37' by the spring 36. Otherwise expressed, the seal 36' is clamped between the enlargement 31 of shaft 29 and member 37 of shaft 37'. The shaft 29 is provided with a stop 77 for limiting and positioning the seal 36' with respect to an outlet conduit section 38 of a conduit means. The shaft 37' is provided with a stop 90 engaging the valve 35 for an obvious purpose.

Conduit means are provided for communicatively connecting the tank 2, valve means 6 and nozzle 4 and includes a conduit 39' connecting the tank and valve means and conduit sections 38 and 38' connecting the nozzle with the valve means. An inverted tube or conduit 39 serves to detachably connect the sections 38 and 38' together. These sections and the tube or conduit 39 are preferably made of relatively rigid plastic tubes so that they retain the shapes to which they have been formed. The operation of the valve means is relatively simple. When the valve 35 is in engagement with the washer 30 water is prevented from flowing through the conduit means 38, 38' and 39 to the nozzle but when the trigger 14 is slidably pressed rear-wardly against the bias of the spring 36 the valve 35 will disengage the washer 30 and allow the water to enter the casing 27 through the conduit 39'. More explicitly, when the valve is held against the fixed gasket 30 by the biasing action of the spring, water under pressure in the tank will only flow into the casing 27 through the conduit 39' but when the trigger is pressed rearwardly to cause a stop 77 on the shaft 29 to engage the bearing 28, the valve 35 will disengage the washer or seat 30 and allow water to flow from the tank 2 into the casing through the conduit 39' and thence through the conduit means 38, 39 and 38' to the nozzle 4 and simultaneously cause the member 32 to actuate the switch 7 to illuminate the lamps 9 and 11 and operate the buzzer 13 as alluded to above.

The components at the front extremity of the barrel of the device or toy constitute a subassembly as depicted in FIG. 10 and will now be described more in detail. The support or mounting 15 is preferably made of plastic like the barrel 1 and is tubular and tapered to complement the barrel. This support is provided with an annular formation 40 having an internal annular transverse groove 41 and an external annular groove 41' and the barrel is provided with a forwardly extending annular portion 42 which is secured in the groove 41' for holding the support to the barrel. It should be noted that the conduit section 38' extends through the annular formation 40 for support thereby. The light responsive means 10 and an annular flange of a reflector 43 is held in the annular groove 41 of the member 40 for holding these components assembled. The lamp 9 is carried by the reflector in a conventional manner. Responsive means 10 is preferably in the form of a round planar lens constructed of a suitable plastic or glass which is preferably of a red color whereby the light directed forwardly by the lamp and reflector will pass through the lens and impart or illuminate the stream of water substantially throughout its length and thereby simulate what may be termed a laser beam of light which promotes interest and fascination in the use of the toy. The diameter of the light beam and its cylindrical or tapered length are

5                                                            6

appreciable and the stream of ejected liquid extends axially therethrough.

The electrical system as depicted in FIGS. 5 and 6 is comparatively simple and will now be described. The end terminals of lamps are connected by a common conductor 44 and the side terminals by a common conductor 46. A conductor 45 connects the terminal contact 33 of the switch means 7 with one of the batteries 8. A conductor 48 is connected to the conductor 44 and branch conductors 47 and 49 are respectively connected to the other terminal contact 34 and to the buzzer 13 and branch conductors 46' from conductor 46 are connected to the other battery and a vibrating member of the buzzer. The base terminals of the batteries are preferably connected by a bar as shown. The buzzer is preferably mounted at the underside of and substantially within the confines of the support or mounting 16 and this mounting is preferably perforated at 50 whereby to promote the noise factor. The buzzer is of a conventional character and is preferably provided with a manual control 13' for adjusting the volume of the noise. In view of the foregoing it will be apparent that the switch means 7 is interposed in electrical circuitry or conductor means whereby activation of the trigger 14 will effect illumination of the lamps and buzzer and operation of the valve means 6 to cause the liquid to be ejected through the nozzle 4 as is further described hereinafter.

The rear lamp 11 and certain of its associated components constituting a subassembly shown in FIG. 5 will now be described. This lamp is carried by a reflector 51 which has a flange fixedly secured in an internal annular groove 52 provided therefor in the support 16 and the light responsive means or lens 12 is provided with an external annular groove 53 which detachably receives an inturned flange 54 of the support. The support may be secured to the barrel 1 as shown in FIG. 5 or in the manner of support 15. The lens 12 is preferably snap connected to the support is somewhat thicker than the lens 10 and provided with a center opening 55 through which the piston rod reciprocates. This lamp, reflector and means 12 also serve to cause rays of colored light, preferably red, to emanate rearwardly concurrently with the rays emitted forwardly and into the stream of liquid through the agency of the front lamp 9, reflector 43 and lens 10 whereby to further promote or enhance fascination for the use of the toy.

Referring now to the structure of the nozzle 4 best depicted in FIG. 9 of the drawing, the same is preferably constructed to form a hollow head 56 provided with a transverse seat 57 in which an annular resiliently flexible member 58 is disposed for rotatably supporting a manually adjustable element 59 having a diametrical passage or orifice 60 extending therethrough through which the liquid is forcibly ejected from the tank. The member 58 constitutes a double seal for the valve. The nozzle can be readily adjusted by inserting an instrument into the passage 60 and turning the element to any one of an infinite number of positions for directing the stream where desired. The nozzle head is preferably constructed from a suitable plastic material and includes a tubular portion 61 for receiving a fore end of the conduit 38' extending from the inverted tube 39, the latter constituting a coupling between the lengths or sections 38 and 38' of the conduit means. As stated above, the valve means 6 is interposed in the conduit means between the tank and nozzle.

With reference to the handle 5, it is preferably provided with a detachable cover 62 whereby to promote ready access to the interior of the handle in order to facilitate replenishment of batteries and/or adjustment or repair of the valve assembly and switch when required. The valve of the nozzle, as alluded to above, is such that the stream of water may be adjusted to vary its direction at any angle desired and the stream can be illuminated throughout at least the major portion of its length irrespective of its angle of direction. The organization is preferably such that when the stream diminishes more or less into a mist of a length in the neighborhood of 3', it denotes or indicates that the air pressure in the tank is down or that the water in the tank is being depleted.

Provision is made to promote safety with respect to the pump and this is preferably accomplished, as shown in FIG. 11, by providing the bearing 70 with a notch 80 and projection 81 which serve to respectively mate with a projection 82 and notch 83 provided on the handle 26 for locking the piston rod in a forward inoperative position so that its rear extremity will not extend rearwardly to cause inadvertent injury to an operator handling the toy. Locking and unlocking of the rod is readily achieved by merely grasping the handle and rotating it clockwise or counter-clockwise relative to the fixed bearing 70.

The invention also contemplates an arrangement as depicted in FIG. 12 for a pair of batteries 80 and 81 in a handle 82. More specifically, the setup includes having the upper base and end terminals of these batteries engage an upper fixed bar 83 and the lower base and end terminals engage a bottom fixed bar 84, the base terminals being pressed by helical springs 85 to insure reliable contacting surfaces. Conductors, not shown, operatively connect batteries with the lamps and buzzer.

In view of the foregoing, it should be manifest that the operation of the toy is relatively simple and accomplished by merely activating the trigger 14. If the water in the tank 2 has been pressurized sufficiently by repeated operation of the pump 3 and the batteries or source of electrical energy are charged, pressing of the trigger will simultaneously cause the water to be expelled through the nozzle 4, effect illumination of the light responsive means at opposite extremities of the toy and operation of the buzzer. The trigger may be activated repeatedly to eject or squirt streams or jets of liquid until the supply of liquid in the tank is exhausted. If, for example, the supply of water is depleted, actuation of the trigger will simultaneously produce colored lights at the opposite extremities and operation of the buzzer so that the toy can be utilized solely for these particular purposes and conversely if the electrical system becomes inoperative, the toy can still be operated to eject a liquid.

It is to be understood that the invention or inventions as disclosed herein contemplate their utilization in a toy rifle, and that any liquid, such as clear or colored water, or chemical compositions may be employed. It is to be further understood that the illuminating means may comprise a lens, reflector and lamp, the reflector and lamp or the latter. It is also to be understood that the components of the toy are preferably designed and constructed whereby to facilitate assembly and disassembly thereof.

The toy or device has been tested and proven to be safe, efficient in operation and particularly conducive to the amusement of those concerned with its use.

7

8

Having thus described my invention or inventions, it is obvious that various modifications or additions to those described may be made in the same without departing from the spirit of the invention and, therefore, I do not wish to be understood as limiting myself to the exact forms, constructions, arrangements, and combinations of the components herein shown and described.

I claim:

1. A toy comprising an elongated housing having a chamber therein for a liquid, a pump including a piston having an exposed rod end extending rearwardly of said toy facilitating manual operation for building up an appreciable amount of pressure in said chamber for ejecting a stream of liquid therefrom an appreciable distance substantially forwardly of said toy, and means for controlling the ejection.

2. The toy defined in claim 1, including means whereby said stream may be illuminated throughout at least the major portion of its length.

3. The toy defined in claim 1, including noise producing means operable by said controlling means.

4. The toy defined in claim 1, including illuminating means operable by said controlling means for illuminating an area in a direction opposite to that of the stream.

5. In combination: an elongated housing having a front end and a rear end, a tank for a liquid disposed in said housing, a pump disposed in said tank and having a piston rod extending rearwardly from said rear end for manual operation to build up an appreciable amount of pressure in said tank, conduit means connected to said tank and having an outlet located at said front end whereby the liquid can be ejected in a stream an appreciable distance therefrom, valve means interposed in said conduit means for controlling the flow of liquid from said tank to said outlet, and means for operating said valve means.

6. In combination: an elongated housing having a front end and a rear end, a tank for a liquid disposed in said housing, a pump disposed in said tank and having a piston rod extending rearwardly from said rear end for manual operation to build up an appreciable amount of pressure in said tank, conduit means connected to said tank and having an outlet located at said front end whereby the liquid can be ejected in a stream an appreciable distance therefrom, valve means interposed in said conduit means for controlling the flow of liquid from said tank to said outlet, means for operating said valve means, and means arranged at said front end for connection with a source of electricity adapted for disposition in said housing for illuminating the stream throughout and about at least the major portion of its length.

7. A toy for ejecting a liquid, said toy comprising wall structure forming an elongated housing having a front end, a rear end, an internal chamber for containing a liquid and a hollow handle for containing a source of electricity, conduit means connected to said chamber and having an outlet at said front end, means for pumping air into said chamber for forcing a stream of liquid through said conduit means for ejection through its outlet forwardly of said front end, valve means disposed in said handle and interposed in said conduit means for controlling the flow of liquid therethrough, means at said front end including a lamp for illuminating the ejected stream throughout at least a major portion of its length, conductor means for connecting said lamp to a source, a switch disposed in said handle and interposed in said conductor means for controlling the operation of

said lamp, and a trigger connected to said handle for simultaneously controlling the operation of said valve means and said switch.

8. The toy defined in claim 7, in which the direction of the ejected stream may be varied within a range from three feet to at least thirty feet.

9. A toy comprising wall structure forming an elongated housing, a chamber and a compartment, said housing having a front and a rear end, a reflector, lamp, and a nozzle located at said front end, conduit means for communicatively connecting said chamber and said nozzle, a pump for applying pressure against a liquid in the chamber, valve means interposed in said conduit means for controlling the flow of a liquid under pressure from said chamber to said nozzle, said compartment serving to contain a source of electricity, conductor means for connecting said lamp to a source, a switch interposed in said conductor means for controlling the flow of electricity to said lamp, and a trigger for operating said valve means and said switch whereby a stream of liquid can be ejected an appreciable distance substantially forwardly from said front end and illuminated throughout at least the major portion of its length.

10. A toy simulating a pistol comprising wall structure forming an elongated barrel of appreciable cross-section dimensions, a tank in the barrel for a liquid and a hollow handle, a cylinder disposed axially in said tank and provided with a check valve, a piston mounted in said cylinder for manual reciprocation for pumping air into said tank, conduit means connected to said tank and having an outlet located at the front of said barrel, valve means interposed in said conduit means, and a trigger operable independently of said piston carried by said handle for operating said valve means for controlling the forced flow of liquid through said outlet.

11. The toy defined in claim 10, including a nozzle connected to said outlet for adjusting the direction of the liquid expelled therefrom.

12. A toy water pistol comprising wall structure forming a barrel and a chamber therein extending throughout the major portion of its length for containing water and a hollow handle, said barrel having a rear extremity provided with a center opening and a front extremity, a cylinder extending axially in said chamber and provided with a check valve for preventing back flow of air from said chamber into said cylinder, a piston disposed in said cylinder and having a rod extending therefrom and through said opening for manipulation for pumping air into said chamber, a nozzle located adjacent to said front extremity, conduit means for communicatively connecting said chamber and said nozzle, valve means disposed in said handle for controlling the flow of water through said conduit means to said nozzle, and a trigger carried by said handle for controlling the operation of said valve means.

13. The toy defined in claim 12, including a lamp and a reflector therefor located adjacent to said nozzle, conductors for connecting said lamp with a source of electricity, and a switch operable by said trigger for controlling the flow of electricity to said lamp.

14. The toy defined in claim 12, including a lamp and light responsive means located adjacent to said nozzle, a switch carried by said handle, conductors for connecting said lamp and switch with a source of electricity, and said trigger also serves to control the operation of said switch so that when said lamp is energized said responsive means will be illuminated to impart a glow to the water ejected through said nozzle.

Copy provided by PTO APS Image Data Base on   11/29/1996

15. The toy defined in claim 12 including a lamp and a reflector therefor located at said rear extremity, conductors for connecting this lamp with a source of electricity, and a switch for controlling the flow of electricity through said conductors to said lamp.

16. A toy water pistol having a front extremity and a rear extremity and an elongated tank for water, a cylinder disposed substantially axially in said tank, a plunger having an inner end disposed in said cylinder and an outer end extending rearwardly through said rear extremity for manual reciprocation to compress air against the water in said tank, a nozzle at said front extremity, conduit means connecting the interior of said tank with said nozzle, valve means interposed in said conduit means, and a trigger for operating said valve means for controlling the flow of any water in said tank through said nozzle via said conduit means.

17. A toy comprising wall structure forming an elongated housing having a chamber therein for a liquid and a compartment for a source of electricity, means for building up an appreciable amount of pressure in said chamber, a nozzle located at the front of said housing, conduit means for connecting said chamber and said nozzle, valve means interposed in said conduit means for controlling the flow of a liquid therethrough, a lamp disposed at said front, a reflector for said lamp, a colored lens disposed in front of said reflector, conductor means for connecting a source with said lamp, a switch interposed in said conductor means for controlling the operation of said lamp, and means for operating said valve means and said switch whereby a stream of liquid ejected through said nozzle will be illuminated throughout the major portion of its length.

18. The toy defined in claim 17, including a lamp, reflector and a colored lens located at the rear of said housing, conductor means for connecting this lamp to said switch and a source for illuminating an area at said rear when said switch is operated.

19. The toy defined in claim 17, including a buzzer located at the rear of said housing, conductor means for connecting said buzzer to said switch and a source for producing a noise when said switch is operated.

20. A toy comprising an elongated housing have a chamber therein for a liquid and a compartment for a source of electricity, means for pumping and maintaining an appreciable amount of air pressure in said chamber, a nozzle at the front of said housing, conduit means for connecting said chamber and said nozzle, valve means interposed in said conduit means, a lamp and a reflector therefor located at said front and a rear of said housing, a colored lens disposed at each reflector, conductor means for connecting said lamps to a source, a switch interposed in said conductor means, and means for operating said valve means and said switch for expelling a stream of liquid from said nozzle and illuminating the stream throughout the major portion of its length.

The toy defined in claim 20, including a buzzer located at said rear, conductor means for connecting said buzzer to said switch and a source for producing noise when said switch is operated.

22. The toy defined in claim 20, in which said nozzle comprises a hollow body, a tubular resilient member secured in said body and provided with an internal annular seat, and an element adjustable in said seat provided with an orifice through which the liquid flows.

23. A toy having a barrel and an offset handle, said barrel having a front extremity and a rear extremity, a colored lens and a lamp carried by said front extremity, a switch carried by said handle, conductor means for connecting said lamp and switch with a source of electricity, a trigger carried by said handle for controlling the operation of said switch to cause said lamp to illuminate said lens, and a nozzle located in front of said lamp through which a liquid can be projected forwardly from said front extremity.

24. The toy defined in claim 23, including a buzzer carried by said rear extremity, and conductor means for connecting said buzzer and said switch whereby said trigger will also control the operation of said buzzer.

25. The toy defined in claim 23, including a second lamp and a second colored lens carried by said rear extremity, conductor means for connecting said second lamp to said switch whereby manipulation of said switch will also control operation of said second lamp to illuminate said second lens.

26. A toy simulating a pistol comprising wall structure forming an elongated barrel of appreciable cross-dimension having a front extremity, a rear extremity and an offset compartment located intermediate these extremities for housing a source of electricity, a lens, a lamp and a reflector therefor carried by said rear extremity, conductor means for connecting said lamp to a source, a switch interposed in said conductor means, and a manual control carried by said compartment for controlling said switch whereby said lamp may be energized to illuminate said lens so that it is visible a remote distance from said rear extremity.

27. The toy defined in claim 26, in which said front extremity is provided with a second lens, a second lamp and reflector therefor, conductor means for connecting said second lamp to a source, and said control also serves to control the energization of said second lamp to illuminate said second lens.

28. An assembly for use in a toy water gun, said assembly comprising an elongated casing having an inlet for a liquid and an outlet therefor, an abutment disposed in said casing between said inlet and outlet and provided with an opening, a shaft reciprocably mounted in said casing and extending through said opening, a valve carried by said shaft and disposed between said abutment and said inlet, means for biasing said valve against said abutment for normally closing said opening, and said shaft being operable to disengage said valve from said abutment whereby liquid entering said inlet may be caused to flow through said outlet via said opening.

29. The assembly defined in claim 28, including a switch, and means connected to said shaft and extending therefrom for operating said switch.

30. A toy water pistol comprising wall structure forming a barrel and a chamber therein extending throughout the major portion of its length for containing water and a hollow handle, said barrel having a rear extremity provided with a center opening and a front extremity, a cylinder extending axially in said chamber and provided with a check valve for preventing back flow of air from said chamber into said cylinder, a piston disposed in said cylinder and having a rod extending therefrom and through said opening for manipulation for pumping air into said chamber, a nozzle located adjacent to said front extremity, conduit means for communicatively connecting said chamber and said nozzle, valve means disposed in said handle for controlling the flow of water through said conduit means to said nozzle, a lamp and a reflector therefor located adjacent to said nozzle, conductors for connecting said lamp with a

**11**

4,239,129

**12**

source of electricity, a switch for controlling the flow of electricity to said lamp, and a trigger carried by said handle for controlling the operation of said valve means and said switch.

31. A toy water pistol comprising wall structure forming a barrel and a chamber therein extending throughout the major portion of its length for containing water and a hollow handle, said barrel having a rear extremity provided with a center opening and a front extremity, a cylinder extending axially in said chamber and provided with a check valve for preventing back flow of air from said chamber into said cylinder, a piston disposed in said cylinder and having a rod extending therefrom and through said opening for manipulation for pumping air into said chamber, a nozzle located adjacent to said front extremity, conduit means for communicatively connecting said chamber and said nozzle, valve means disposed in said handle for controlling the flow of water through said conduit means to said nozzle, a lamp and light responsive means located adjacent to said nozzle, a switch carried by said handle, conductors connecting said lamp and switch with a source of electricity, and a trigger carried by said handle for controlling the operation of said valve means and said switch so that when said lamp is energized said responsive means will be illuminated to import a glow to the water ejected through said nozzle.

32. A toy comprising an elongated housing have a chamber therein for a liquid and a compartment for a source of electricity, means for pumping and maintaining an appreciable amount of air pressure in said chamber, a nozzle at the front of said housing, conduit means for connecting said chamber and said nozzle, valve means interposed in said conduit means, a lamp and a reflector therefor located at said front and a rear of said housing, a buzzer located at said rear, a colored lens disposed at each reflector, conductor means for connecting said lamps and buzzer to a source, a switch interposed in said conductor means, and means for operating said valve means and said switch for expelling a stream of liquid from said nozzle and illuminating the

stream throughout the major portion of its length and causing said buzzer to produce noise.

33. A toy comprising an elongated housing having a chamber therein for a liquid and a compartment for a source of electricity, means for pumping and maintaining an appreciable amount of air pressure in said chamber, a nozzle at the front of said housing constructed to provide a hollow body, a tubular resilient member secured in said body and provided with an internal annular seat, an element adjustable in said seat provided with an orifice, conduit means for connecting said chamber and said nozzle, a valve interposed in said conduit means, a lamp and a reflector therefor located at said front and a rear of said housing, a colored lens disposed at each reflector, conductor means for connecting said lamps to a source, a switch interposed in said conductor means, and means for operating said valve means and said switch for expelling a stream of liquid from said orifice and illuminating the stream throughout the major portion of its length.

34. A toy having a barrel and an offset handle, said barrel having a front extremity and a rear extremity, a colored lens and a lamp carried by each of said extremities, a switch carried by said handle, conductor means for connecting said lamps and switch with a source of electricity, and a trigger carried by said handle for controlling the operation of said lamps to illuminate said lenses so they are respectively visible remote distances from said extremities.

35. A toy simulating a pistol comprising wall structure forming an elongated barrel of appreciable cross-dimension having a front extremity, a rear extremity and an offset compartment located intermediate these extremities for housing a source of electricity, a lens, lamp and a reflector therefor carried by each of said extremities, conductor means for connecting said lamps to a source, a switch interposed in said conductor means, and a manual control carried by said compartment for controlling said switch whereby said lamps can be energized to illuminate said lens so they are respectively visible remote distances from said extremities.

* * * * *

5

10

15

20

25

30

35

40

45

50

55

60

65

Copy provided by USPTS from the PTO APS Image Data Base on 11/29/1996

3

**Alan B. Amron**
77 Horton Place, Syosset New York 11791


Sent Via Certified Letter


February 17, 1997


Mr. Marvin Azrak
Azrak-Hamway International Inc.
1107 Broadway
Suite #808
New York, New York  10010-2894

Dear Mr. Azrak:

I tried to meet with you during toy fair last week to discuss
this matter face to face, however I was told that you were
not available.  Therefore I must notify you via this
certified letter as to the assignment of the Esposito Patent
#4,239,129 to me. (see the assignmen. attached here)

I purchased a Remco Item #16073, One Pump Super Pump SP-500
Air Pressure Water Gun, from a K-Mart store recently that
noticed the AMRON Patent Pending and the Esposito Patent
#4,239,129 both on the packaging and on the gun molds itself.

Neither Talk To Me Products, Inc. nor I have received a
royalty check from you within the last year (95 thru 96 to
present day 97) and hereby demand an accounting for the sales
worldwide on all your "Air Pressurized Water Guns" along with
a check for the royalty amounts due within 10 business days,
or contact me to discuss this further.

Sincerely Yours,


Alan B. Amron


cc:   Roy Peshkin (TTMP)
      Melvin Gale (TTMP)
      Scott Stuart, Esq.
      Paul Eisenstein, Esq.




Phone (516) 692-2830                    Fax (516) 364-0238

## ASSIGNMENT

Talk To ME Products, Inc., a New York corporation, and Roy Peshkin (hereinafter "TTMP"), for one dollar and other good consideration, hereby assign to Alan Amron and Talk To Me Programs, Inc. (hereinafter "AMRON") the entire right, title and interest in and to the United States Patent #4,239,129 filed November 29, 1978 and issued to Gary F. Esposito December 16, 1980 and assigned to Talk To Me Products, Inc. for air pressurized toy guns, together with the goodwill appurtenant thereto. This assignment from TTMP to Amron includes the following:

1. AMRON shall have the right to be substituted for TTMP as licensor in the licence agreement with Azrak Hamway International (REMCO) and to pursue that license in his own company name. In view of this ASSIGNMENT, Azrak Hamway International (REMCO) is requested to substitute Amron for TTMP in that license agreement and today pay Amron all the back royalties due for sales worldwide, as well as all future royalties as they come due.

2. AMRON shall have the right to take advantage of any use of the ESPOSITO Patent #4,239,129 by any licensee of TTMP and such use shall inure to the benefit of AMRON.

3. AMRON shall have the right, in his own name or company name, to sue for past infringement by others of the Esposito Patent #4,239,129, including any claim of TTMP as to past and/or future damages arising from such infringement.

4.  ANRON shall have the right to assign or license all
of the rights, title and interest granted herein.

TALK TO ME PRODUCTS, INC.

By: _____

Roy Peshkin, President

_____

Roy Peshkin

Dated: 2|12|97

**SENDER:**
- Complete items 1 and/or 2 for additional services.
- Complete items 3, 4a, and 4b.
- Print your name and address on the reverse of this form so that we can return this card to you.
- Attach this form to the front of the mailpiece, or on the back if space does not permit.
- Write *Return Receipt Requested* on the mailpiece below the article number.
- The Return Receipt will show to whom the article was delivered and the date delivered.

I also wish to receive the following services (for an extra fee):
1. ☐ Addressee's Address
2. ☐ Restricted Delivery

Consult postmaster for fee.

**3. Article Addressed to:**

MARVIN AZRAK
AZRAK-HAMWAY INT. INC.
1107 Broadway   Suite #808
New York, N.Y. 10010-2894

**4a. Article Number**
418873920

**4b. Service Type**
☐ Registered    ☒ Certified
☐ Express Mail    ☐ Insured
☐ Return Receipt for Merchandise    ☐ COD

**7. Date of Delivery**

**5. Received By: (Print Name)**

**8. Addressee's Address (Only if requested and fee is paid)**

**6. Signature: (Addressee or Agent)**
X _Reid_

PS Form **3811**, December 1994          102595-97-B-0179          **Domestic Return Receipt**

Is your RETURN ADDRESS completed on the reverse side?

Thank you for using Return Receipt Service.

---

Z 418 873 920

**US Postal Service**
**Receipt for Certified Mail**
No Insurance Coverage Provided.
Do not use for International Mail (See reverse)

Sent to _AZRAK-Hamway_
Street & Number _1107 Broadway_
Post Office, State, & ZIP Code _New York, NY. 10010_

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Special Delivery Fee | |
| Restricted Delivery Fee | |
| Return Receipt Showing to Whom & Date Delivered | |
| Return Receipt Showing to Whom, Date, & Addressee's Address | |
| TOTAL Postage & Fees | $ 5.20 |
| Postmark or Date | |

NOTICE

PS Form **3800**, April 1995

**4**

TOTAL P.01

# Paul Eisenstein

### Counselor at Law

7600 Jericho Turnpike
Woodbury, New York 11797

516-496-2828
Fax # 516-496-3450

March 5, 1997

Azrak-Hamray International Inc.
1107 Broadway
Suite 808
New York, New York 10010-2894

Re:  Alan Amron

Dear Sirs:

I am the attorney for Alan Amron of Syosset, New York.

On February 17, 1997 Mr. Amron wrote to you with regard to the
"Esposito" Patent, #4,239,129 which is the subject of a license
agreement dated March 25, 1992 between Talk to Me Products Inc. and
Azrak-Hamway International Inc./Remco.  Mr. Amron furnished to you
a copy of an assignment agreement dated February 12, 1997,
assigning the interest in said patent and in the license agreements
to Mr. Amron.

As indicated in the letter of February 17, 1997 there had been no
royalty checks paid by your company from 1995 to the present nor
has there been an accounting for sales worldwide on all of your
"Air Pressurize Water Guns".

Pursuant to paragraph 9.3 of your license agreement you had thirty
days to cure this default.  In the event the default is not cured
my client will commence action in State Court for an accounting and
to recover any monies shown to be due.  My client will also
consider your license agreement as terminated.

If you wish to resolve this matter without resorting to litigation
please have your attorneys contact this office.

Very truly yours,

PAUL EISENSTEIN

PE:mtb
cc:  Jesse Rothstein, Esq.

P.01

**5**

Alan B. Amron
77 Horton Place, Syosset New York 11791

Sent Via Fax and Regular Mail

March 19, 1997

Mr. Marvin Azrak
Azrak-Hamway International Inc.
1107 Broadway
Suite #808
New York, New York   10010-2894

Dear Mr. Azrak:

This letter is to put you, K-Mart and Warner Brothers
Consumer Division on written notice of your persistent breech
of our assigned license agreement and the ultimate
intentional and wilful infringement of our assigned United
States Patent #4,239,129.

Consider this Cease and Desist letter your written notice to
allow me to claim compensatory as well as treble damages in
litigation.

I purchased a Remco Item #16144, One Pump Super Pump SP-200
Air Pressure Water Gun, from the K-Mart store #3979, see
the actual receipt attached here, whereby Remco/Azrak-Hamway
International has intentionally, and obviously, left off the
previously noticed AMRON Patent Pending and the Esposito
Patent #4,239,129 on both the packaging and on the product
gun molds themselves.  This shows Remco's intent to defraud.

Neither Talk To Me Products, Inc. nor I have received a
royalty check from you within the last year (95 thru 96 to
present day 97) and hereby, again, demand an accounting for
the sales worldwide on all your "Air Pressurized Water Guns"
along with a check for the royalty amounts due within 10
days, or we will commence litigation against K-Mart, Warner
Brothers Consumer division and Azrak-Hamway for the
intentional breech and the wilful infringement of claims #1
#10, #11 and #12 of our assigned United States Patent number
4,239,129.

Very truly yours,

Alan B. Amron

cc:   Roy Peshkin, Melvin Gale (TTMP)
      Scott Stuart, Esq.
      Paul Eisenstein, Esq.
      K-Mart (Purchased infringing Item #16144)
      Warner Brothers Consumer Division (Jonny Quest license)

Phone (516) 692-2830             Fax (516) 364-0238

LEVITTOWN KMART 3929

PLEASE RETAIN RECEIPTS FOR RETURN AND
EXCHANGES  90 DAY RETURN POLIC

| | | | |
|---|---|---|---|
| 1 | 05016316145 | WATER GUN | .2 |
| 2 | 05016316145 | WATER GUN | .9 |
| 3 | 05016316430 | WATERGUN SET | .59 |
| 4 | 0446740 | NABISCO | .99 |
| 5 | 016000 9702 | CEREAL | .79 |
| 6 | 016000 9702 | CEREAL | .79 |

SUBTOTAL          .54
TAX              .27
TOTAL           26.01
AM EXPRESS CHARGE TENDER   26.01
CHANGE             .00

#26-9-26 137 04 03/17/97 2 39 04:18

**6**



**7**





FIG. 1

FIG. 2



FIG. 3

FIG. 4



FIG. 5



FIG. 6

FIG. 7

FIG. 8

# WATER GUN

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

This application is a continuation-in-part of application's prior copending application Ser. No. 630,259 filed Nov. 10, 1975 and subsequently abandoned. This invention relates generally to toy water guns and is particularly concerned with electrically operated toy water guns.

### 2. DESCRIPTION OF THE PRIOR ART

Conventional toy water guns usually depend for their operation upon a trigger actuated mechanical pumping means and produce a continuous stream of water for a period of time corresponding with the actuation of the trigger and the level of pressure produced. Such guns, however, often rely upon a plurality of trigger actuations to accomplish a series of shots, i.e., spurts, of water therefrom and, when operated in this way, quickly tire the user.

The present invention solves these problems. Thus, it is an object of the present invention to provide an improved water gun which can be fired in a series of shots by one actuation of its trigger.

Another object of the invention is to provide such a water gun which is electrically operated and which will maintain a high water pressure over a substantial period of time.

Still another object of the invention is to provide such a water gun which incorporates a simple pump and valve means to accomplish its purposes.

Yet another object of the invention is to provide such a water gun which is of simple, economical and sturdy design.

Other and further objects of the invention will become apparent from the following description when read in conjunction with the accompanying drawing.

### SUMMARY OF THE INVENTION

The present invention employs a housing in the form of a conventional pistol but having a reservoir accommodating a predetermined quantity of water. The housing includes a handle having a water-tight compartment accommodating one or more batteries actuated by a trigger whereby a switch may be cloased to energize a motor driven pump which is also located in the handle. The pump draws water from the reservoir into a chamber and then discharges the water therefrom through a nozzle in the barrel of the pistol. The intake of the water into the chamber is accomplished through a one-way entry valve and its discharge is accomplished through a pressure operated, one-way exit valve. When the chamber is full, the one-way valve is closed, thereby permitting discharge through the pressure operated exit valve. With such discharge, however, the pressure in the chamber drops, thereby permitting the entry valve to open so as to draw more water into the chamber and thereafter close when the water pressure builds up to a point where the water may be discharged through the exit valve. The resulting series of spurts of water will continue as long as the trigger is actuated and the water supply in the reservoir remains.

In a modified form of the invention, the housing is in the form of a conventional, portable machine gun wherein the stock includes a water tight compartment communicating with a battery operated motor and pump assembly and valves in the vicinity of the handles

of the gun to accomplish a series of spurts of water from the barrel thereof in the general manner previously described.

## BRIEF DESCRIPTION OF THE DRAWINGS

In the drawings:

FIG. 1 is a cross-sectional, diagrammatic view of one embodiment of the invention;

FIG. 2 is a circuit diagram of the electrical system employed in such embodiment of the invention;

FIG. 3 is a modified form of the invention arranged as a machine gun;

FIG. 4 is a circuit diagram of the electrical system employed in said modified form of the invention;

FIG. 5 is a fragmentary, cross-sectional view of the valve system employed in said modified form of the invention;

FIG. 6 is a view taken about the line 6—6 of FIG. 5;

FIG. 7 is another fragmentary, cross-sectional view of the valve system employed in said modified form of the invention;

FIG. 8 is a view taken about the line 8—8 of FIG. 7.

Throughout the various views, similar numerals are employed to refer to similar parts of the invention.

## DESCRIPTION OF THE PREFERRED EMBODIMENT

As shown in FIG. 1 of the accompanying drawing, one embodiment of the present invention comprises a housing, generally designated by the numeral 10, having the external appearance of a pistol. The housing 10, includes a barrel 11, a handle 12 and a trigger guard 13. The barrel 11 is provided with a removable plug 14 engaged with an aperture 15 communicating with a reservoir 16 in the barrel 11 wherein a quantity of water 18 may be accommodated.

The handle 12 comprises a first chamber 19 accommodating energizing means such as one or more electrical batteries 20. Chamber 19 also accommodates a motor 21, a pump 22 and a second chamber 23 having a one-way intake valve 24 and a one-way exit valve 25. Chamber 19 is sealed against leakage from the reservoir 16 by a partition 26.

The intake valve 24 communicates with the reservoir 16 by means of a drain tube 28 which extends through the partition 26. The exit valve 25 communicates with a nozzle 29 by means of an exhaust tube 30 which also extends through the partition 26, the said nozzle 29 being seated in the mouth of the barrel 11.

A trigger 31 is provided within the trigger guard 13 and functions as a single pole single throw switch (not shown in FIG. 1) which is indicated diagrammatically by the numeral 32 in FIG. 2. When the trigger 31 is pulled, the switch 32 is closed, thereby permitting the batteries 20 to energize the motor 21 and actuate the pump 22. The electrical circuit involved is depicted in FIG. 2. Upon actuation of the pump 22, water is drawn from the reservoir 16 through the drain tube 28 and intake valve 24 into the chamber 23 where it is accumulated and then discharged through exit valve 25, exhaust tube 30 and nozzle 29.

An important feature of the invention resides in the fact that the water is discharged from the nozzle 29 in a series of spurts. This is accomplished by having the intake valve 24 and exit valve 25 permit alternate flow of water therethrough, such mode of operation being accomplished by means well known in the art. For example, the intake valve 24 may be in the form of a

one-way valve and the exit valve 25 may be in the form of a spring-biased poppet valve. Thus, upon the operation of the pump 22, water may be drawn through the intake valve 24 until the chamber 23 is filled, during which time the exit valve 25 remains closed. Thereafter, upon continued operation of the pump 22, the water pressure within the chamber 19 increases so as to close the intake valve 24 and open the exit valve 25, thereby permitting discharge of a quantity of water until the pressure within the chamber 23 decreases so as to permit opening of the intake valve 24 and closing of the exit valve 25. Since the motor 21 operates at high speed and the pump 22 is geared down to permit a correspondingly substantial power, it will be seen that the spurts of water thus produced will emerge from the nozzle 29 with great rapidity, thereby simulating a series of "shots" from the pistol which will continue during the actuation of the trigger 31.

The foregoing description of the operation of the intake and exhaust valves of the chamber 23 is intended to be illustrative only. It is to be understood that other means, such as piston-operation may also be employed to accomplish similar results, such operation including intake and exhaust strokes of the piston in the chamber 23 so as to provide a series of spurts of water from the chamber 23 through the nozzle 29. This mode of operation may be more clearly understood from a consideration of the subsequently described modified form of the invention.

A closure member 35 is hingeably secured to the handle 12 so as to permit access to its interior when secured.

A modified form of the invention is depicted in FIG. 3 through 8. As may be seen in FIG. 3, this form of the invention has the external conformation of a machine gun and includes a shoulder stock 40, a body portion, generally designated by the numeral 41, front and rear handles, generally designated by the numerals 42, 43, a barrel, generally designated by the numeral 44, and an ammunition clip receptacle, generally designated by the numeral 45.

The shoulder stock 40 is provided with an aperture 46 accommodating a removable plug 47 communicating with a reservoir 48 within the shoulder stock 40, said reservoir 48 accommodating a quantity of water 49. The reservoir 48 communicates with a housing 50 of a valve and pump assembly, generally designated by the numeral 51, disposed within the body portion 41, said communication being by means of a tube 52 connected to said reservoir 48 and said housing 50. The valve and pump assembly 51 surmounts a cam and motor assembly, generally designated by the numeral 53, located within the ammunition clip receptacle 45 and energized by a suitable source of electricity such as batteries 47, disposed within the front handle 42 and activated by a trigger 54 and switch 55.

As hereafter indicated, when the cam and motor assembly 53 is energized, water is drawn from the reservoir 48 through the tube 52 into the valve and pump assembly 51, whence it is discharged through tube 56 and the nozzle 57 in the barrel 54, such discharge being in spurts or in spurts of water.

The electrical system involved is depicted diagrammatically in FIG. 4 and is similar to the electrical system employed in the first described embodiment of the invention. As indicated in FIG. 4, the electrical system includes the previously mentioned cam and motor assembly 53, batteries 47, a condenser 47a connected in

parallel with the batteries 47, a switch 55, and conductors 60, 61, 62, the cam and motor assembly 53 being surmounted by the valve and pump assembly 51 depicted in broken lines.

The operation of the valve and pump assembly 51 may be better understood from a consideration of FIGS. 5, 6, 7 and 8. As may be seen in FIGS. 5 and 6, the motor 53a is provided with a shaft 53b extending through a plate 69 and connected to a circular cam 70 having an upright eccentric pin 71 slidably engaged with a slot 72 formed in a base plate 73 engaged with a reciprocable piston 74. The piston 74 is accommodated within a cylinder 75 in the valve and pump assembly 51. The aforementioned tube 52 communicates with an intake valve 80 within the housing 50, the said valve 80 being surmounted by an aperture 81 formed in the plate 69 and communicating between said valve 80 and a chamber 82. Valve 80 is provided with a one-way valve gate 80a. Said chamber 82 also communicates with a duct 83 extending from the interior 84 of the cylinder 75. The duct 83 also communicates through channel 85 with the chamber 86 of exit valve, generally designated by the numeral 86a and having a poppet member 86b. Chamber 86 communicates with the aforementioned tube 56.

It will be seen that when the switch 55 is closed by the trigger 54 so as to activate the motor 53a, the cam 70 is rotated, thereby causing the pin 71 to reciprocate the piston 74 within the cylinder 75 and alternately draw water from the reservoir 48 into the interior 84 of the cylinder 75 and discharge it through the tube 56 and nozzle 57 of the barrel 44. As shown in FIGS. 5 and 6, the piston 74 is disposed at the end of its intake stroke whereby water is drawn through tube 52, intake valve 80, chamber 82 and into the interior 84 of cylinder 75. Thereafter, with further rotation of the cam 70, as depicted in FIGS. 7 and 8, the piston 74 accomplishes its exhaust stroke whereby it is moved to the opposite end of the cylinder 75 so as to discharge the water in the interior 84 of the cylinder 75 through duct 83, channel 85, exit valve 86a and tube 56 connected to the nozzle 57 depicted in FIG. 3. During this exhaust stroke, valve gate 80a blocks return of the water to the reservoir depicted in FIG. 3. It is to be understood that valves 80 and 86b may comprise any of a variety of one-way or poppet valves of conventional design. Upon further rotation of the motor the piston 74 performs its intake stroke whereby it is returned to the position depicted in FIGS. 5 and 6 and is ready to begin its above described exhaust stroke again.

Thus, it will be seen that by means of this reciprocating movement of the piston 74, water is alternately drawn from the reservoir 48 and discharged through the nozzle 57, such discharge being interrupted by the said intake strokes so that the discharge is accomplished intermittently or in spurts rather than in a continuous stream.

It will also be observed that this effect is achieved during continuous pull of the trigger 54 whereby the switch 55 is closed, and does not require repeated or a series of pulls of the trigger 54. The trigger 54 is biased by a spring 90, so that when released, the trigger 54 opens the switch 55 and thereby terminates the intermittent discharge of water from the nozzle 57.

I claim:
1. In a toy water gun, the combination comprising:

4,022,350

<div style="display:flex"><div>

5

a. a housing having the external appearance of a pistol and including a barrel, a handle and a trigger guard;

b. an aperture formed in said barrel;

c. the aperture being provided with a removable plug;

d. the barrel including a reservoir accommodating water introduced through said aperture;

e. the handle including a first chamber accommodating electrical means and water distribution means;

f. said water distribution means communicating with said reservoir and a nozzle provided in the barrel;

g. a trigger disposed within said trigger guard and including switch means;

h. said water distribution means including a motor, a pump and a second chamber;

i. said motor and pump being energized by said electrical means when said switch means is actuated by said trigger;

j. said second chamber being provided with intake and exit valves operating in sequence, whereby a series of spurts of water is drawn from the reservoir through the intake valve into the second chamber and dispensed therefrom through the exit valve and said nozzle when said motor and pump are energized;

k. said handle being provided with closure means.

2. In a device according to claim 1, a water-tight partition between said reservoir and said first chamber.

3. In a toy water gun having the external conformation of a machine gun including a shoulder stock, body

</div><div>

6

portion, front and rear handles, a barrel and an ammunition clip receptacle, the combination comprising:

a. reservoir formed within said shoulder stock and adapted to accommodate a quantity of water;

b. an aperture formed in said shoulder stock and communicating with said reservoir;

c. a removable plug accommodated within said aperture;

d. reciprocable pump and valve means disposed within said body portion;

e. tubular means communicating between said reservoir and said reciprocable pump and poppet valve means;

f. tubular means communicating between said reciprocable pump and poppet valve means and a nozzle formed in said barrel.

g. electric battery means disposed within one of said handles;

h. a motor and cam assembly communicating with a reciprocable piston in said reciprocable pump and poppet valve means;

i. a spring-biased trigger disposed within said body portion and communicating with a switch;

j. said motor and cam assembly being energized by said electric battery means when said spring-biased trigger actuates said switch, thereby reciprocating said piston and drawing water from said reservoir through said poppet valve means and discharging it intermittently through said nozzle;

k. one-way valve means disposed between said reciprocable pump and poppet valve means and said reservoir.

* * * * *

</div></div>

68

# United States Patent [19]

**Amron**

[11] **4,022,350**

[45] **May 10, 1977**

[54] **WATER GUN**

[76] Inventor: Alan B. Amron, 70 Hofstra Drive, Plainview, N.Y. 11803

[22] Filed: **July 8, 1976**

[21] Appl. No.: **703,315**

### Related U.S. Application Data

[63] Continuation-in-part of Ser. No. 630,259, Nov. 10, 1975, abandoned.

[52] U.S. Cl. .................................... **222/79; 222/333**
[51] Int. Cl.² .......................................... **A63H 3/18**
[58] Field of Search .................... 222/79, 333, 383; 239/332, 587

[56] **References Cited**

UNITED STATES PATENTS

| | | | |
|---|---|---|---|
| 2,285,292 | 6/1942 | Mangels | 222/79 |
| 3,374,708 | 3/1968 | Wall | 222/79 X |
| 3,901,449 | 8/1975 | Bochmann | 239/332 |

*Primary Examiner*—Stanley H. Tollberg
*Attorney, Agent, or Firm*—Charles Marks

[57] **ABSTRACT**

A toy water gun is provided with a battery driven motor and pump assembled with a chamber communicating with a water reservoir and a nozzle in the gun. When the motor and pump are energized, intake and exit valves operate alternately to determine a series of spurts of water from the chamber through the nozzle.

**3 Claims, 8 Drawing Figures**



**8**

## LICENSE AGREEMENT

This Agreement is between TALK TO ME PRODUCTS, INC. having an office at 85 Rodeo Drive, Syosset, NY 11791 (referred to hereinafter as "TMP"), and AZRAK-HAMWAY INTERNATIONAL, INC./REMCO having an office at 1107 Broadway, New York, New York 10010 (referred to hereinafter as "REMCO").

WHEREAS, TMP warrants that it possesses rights to license certain technology, patents, know-how, designs, marketing concepts, trademarks, including One Pump and One Pump Soaker, and patent applications to be filed relating to air pressure water guns capable of adequately pressuring water within a water reservoir in one stroke of a piston pump as illustrated in the schematic drawings of enclosed Exhibit A;

WHEREAS, REMCO desires to manufacture and market products under licensure from TMP and to use the rights of TMP as further described in this Agreement,

NOW, THEREFORE, in consideration of the mutual promises and covenants contained herein, the parties agree as follows:

## ARTICLE I - License Grant

1.1 Subject to the terms and conditions hereinafter set forth, and in consideration of the payments provided in Article II

herein, TMP hereby grants and REMCO hereby accepts an exclusive license under all the worldwide rights of TMP in the design, marketing concepts, patents, patent applications, trademarks and copyrights whether existing or hereinafter developed, owned or controlled by TMP relating to air pressure water guns described in the two pages of the attached Exhibit A and any improvements thereto (hereinafter "Licensed Products"). The license allows REMCO to manufacture or have manufactured for it Licensed Products anywhere in the world for sale under the REMCO name or trademark anywhere in the world. The license granted to REMCO herein shall not include any right or permission to sublicense any of the rights acquired herein to any third parties without the prior written approval of TMP, except that REMCO shall be permitted to grant sublicenses to any subsidiary or wholly-owned affiliate on the same terms and conditions set forth herein.

1.2   TMP has filed an Intent to Use application at the United States Patent and Trademark Office for the trademark One Pump under 15 USC § 1051(b), and hereby agrees to assign said trademark and application to REMCO.

## ARTICLE II   -   License Payments and Royalty

2.1   REMCO agrees to pay TMP a continuing royalty of five percent (5%) of the net selling price received by REMCO for any Licensed Products sold in any country where TMP has acquired patent protection for licensed products or applied for patent protection

2

or has the right to file for patent protection for any aspect of licensed products, and a two percent (2%) royalty in all other countries. For any country where patent protection for any aspect of licensed products has been requested and no patent rights have been conferred or granted within five years of application for such patent, or where all patent protection has terminated, the royalty for Licensed Products in such country shall be two percent (2%). No costs incurred for the manufacture, sale, promotion, import duties, brokerage fees or sales commissions of any of the Licensed Products shipped by REMCO shall be deducted from any payments due TMP under this Agreement; however, costs for paid taxes, discounts, allowances and returns may be deducted.

2.2 Upon execution of this Agreement, REMCO hereby agrees to deliver to TMP a check in the amount of Fifty Thousand Dollars ($50,000) as an advance for royalties due under paragraph 2.1 above. This advance shall be non-refundable and may be applied by REMCO against any payment including the first payment, due for royalties. No other royalty payment should be due TMP for the sale of Licensed Products under any existing agreement between TMP and REMCO including the agreement of March 25, 1992 regarding United States patent No. 4,239,129.

2.3 REMCO hereby agrees and warrants to use its best efforts to market Licensed Products in North America and elsewhere in order to maintain the exclusivity of the license granted in paragraph 1.1

3

above, and shall promote Licensed Products on television in major markets in the United States. Should REMCO fail to make sales of Two Million Dollars ($2,000,000) of Licensed Products in North America during any calendar year, the grant in paragraph 1.1 shall become non-exclusive.

## ARTICLE III - Records, Reports and Payments

3.1 Promptly on the 30th day following the end of each calendar quarter subsequent to the first shipment by REMCO of any product licensed under paragraph 1.1 above, REMCO shall furnish to TMP complete and accurate statements, certified by an officer of REMCO to be accurate, showing the number and description of all Licensed Products shipped during the preceding calendar quarter, together with all payments due TMP for such shipments. Such statements shall be furnished to TMP whether or not any of the Licensed Products have been shipped during the quarter. Receipt or acceptance by TMP of any of the statements furnished pursuant to this Agreement or of any sums paid hereunder shall not preclude TMP from questioning the correctness thereof for a period of three (3) years following receipt of said statement, and in the event that any inconsistencies or mistakes are discovered in such statements or payments in the favor of TMP, they shall immediately be rectified and the appropriate adjustments made.

4

3.2   REMCO agrees to keep accurate books of accounts and records covering all transactions relating to the license hereby granted, and TMP or its duly authorized representatives shall have the right, upon reasonable notice, at reasonable hours of the day, to examine said books of account and records and of all other documents and material in the possession or under the control of REMCO with respect to the subject matter and the terms of this Agreement, and shall have free and full access thereto for said purposes and for the purposes of making extracts therefrom.  Remco need only permit one such examination during any calendar year. TMP agrees that it will bear its own costs and expenses of such examination.   All books of account and records of REMCO shall be kept available for at least three (3) years after the end of each period covered by statements, and REMCO agrees to permit inspection thereof by TMP during such three (3) year periods.

3.3   All payments and reports hereunder shall be mailed to TMP by the required date at its address designated for notices hereunder.

## ARTICLE IV  -  Indemnifications

4.1   REMCO shall notify TMP in writing of any infringements by others which may come to the attention of REMCO of any patent or trademark rights licensed herein, and TMP shall take appropriate legal action, including litigation, if appropriate, to remedy any

5

such infringements that produce substantial competition to REMCO for any of the fifty (50) largest retail or wholesale accounts for Licensed Products, and such action shall be at the sole expense of TMP. For all litigation commenced at the request of REMCO, TMP shall retain 80% of the net proceeds of any such infringement litigation after deduction for all expenses or legal fees reasonably incurred by TMP in pursuing infringements of such rights, and 20% of such net proceeds shall be paid within 30 days to REMCO. Should REMCO accept an invitation by TMP to join in any such action, REMCO shall share in any recovery in the same proportion as its contribution for the expenses of such action. REMCO shall not institute any suit or take any action on account of any infringements or imitations without first obtaining the written consent of TMP to do so. Provided, however, if TMP fails to file a lawsuit against anyone infringing the rights licensed herein within forty-five (45) days of receiving written notification from REMCO of such infringement, REMCO shall have the right to file a legal action against any such infringer at its own expense, and TMP shall not share in any recovery unless TMP accepts an invitation by REMCO to join in any such lawsuit. In such event, TMP shall share in any recovery in the same proportion for the expenses of such lawsuit.

4.2 REMCO hereby indemnifies TMP and undertakes to defend TMP against and hold TMP harmless from any claims, suits, loss or damage from a third party arising out of any allegedly unauthorized

6

use of any patent, process, idea, method or device by REMCO in connection with products licensed in paragraph 1.1 above.   REMCO shall also indemnify TMP and hold harmless from any and all claims arising out of the manufacture, sale or use of the products produced by REMCO under this Agreement, except for those matters arising out of a breach of any warranty contained herein of TMP. REMCO agrees to obtain, at its own cost and expense, product liability insurance providing adequate protection (but in no event shall the amount of this coverage be less than one million dollars) for TMP and itself against any such claims or suits arising from any alleged defects in products produced by REMCO under this Agreement.

4.3  TMP represents that it has no knowledge of or reason to have knowledge of any conflicting right of any third party with respect to the rights conveyed herein to REMCO. TMP represents and warrants that it has, and will have throughout the term of this Agreement, the right to license the rights conveyed herein including the trademark One Pump and One Pump Soaker to REMCO in accordance with the terms and provisions of this Agreement and that the making of this Agreement by TMP does not violate any agreements, rights or obligations existing between TMP and any other person, firm or corporation.  TMP hereby indemnifies and holds Remco and its officers, directors, employees, representatives and agents harmless for any and all loss, cost or expense resulting from a breach of the warranties herein.

7

4.4  A party claiming indemnity as provided herein shall give prompt notice, to the other party, of any legal proceeding or other written claim which may give rise to such indemnification, and shall cooperate with counsel for the indemnifying party in connection with the conduct of the defense of any legal action giving rise to such indemnification.  The indemnifying party shall have the right to select counsel.

## ARTICLE V  -  Patent Notice

5.1  REMCO shall cause to be imprinted irremovably and legibly, on each product manufactured, distributed or sold by or through them under this Agreement, or the packaging thereof a statement that the product is licensed under Amron patent pending and shall promptly add the number of each relevant patent as it issues.

## ARTICLE VI  -  Product Samples

6.1  REMCO agrees to furnish TMP, free of cost, one dozen of each product covered by this Agreement together with all associated packaging for approval before its sale.  Approval shall be deemed automatic if no objection is made by TMP within five (5) business days of receipt, nor shall such approval be unreasonably withheld.

8

## ARTICLE VII   -   Specific Undertaking of License

During the term of this Agreement, REMCO agrees that:

7.1   It will not attack the title of TMP to any of the rights conveyed herein, nor will it attack the validity of the License granted hereunder.

7.2   It will not harm, misuse or bring into disrepute the rights of TMP granted herein.

7.3   It will manufacture, sell and distribute the products licensed under this Agreement in an ethical manner and in accordance with the terms and intent of this Agreement.

7.4   It will not create any expenses chargeable to TMP without prior written approval of TMP.

## ARTICLE VIII  -   Termination

8.1   TMP shall have the right at its option to cancel this Agreement at any time REMCO has failed to make royalty payments as set forth in Article II.  If TMP elects to cancel this Agreement under this section 8.1 it shall give at least thirty (30) days written notice to REMCO, and REMCO may make the requisite royalty

9

payments within such thirty (30) day period to prevent cancellation under this section 8.1.

8.2   In the event REMCO files a petition for bankruptcy or is adjudicated a bankrupt or if a petition in bankruptcy is filed against it or it becomes insolvent or makes an assignment for the benefit of its creditors or any arrangement pursuant to any bankruptcy law or if it discontinues business or if a receiver is appointed for it or its business, the license granted hereunder, without notice, shall terminate automatically upon the occurrence of any such event.  In the event the license granted hereunder is terminated under this paragraph 8.3, neither REMCO nor its receivers, representatives, trustee, agents, administrators, successors and/or assigns shall have any right to sell, exploit or in any way deal with or in any Licensed Product or any carton, container, packing or wrapping material, advertising, promotional or display material pertaining to any Licensed Product that had not been in inventory at the time a petition for bankruptcy is first filed.

8.3   If REMCO or TMP, as the case may be, shall violate any of its other obligations under the terms of this Agreement, which violation materially adversely affects another party, the materially adversely affected party, as the case may be, shall have the right to terminate the license hereby granted upon thirty (30) days notice in writing, and such notice of termination shall become

10

effective unless the offending party shall completely remedy the violation within the thirty (30) day period and satisfy the materially adversely affected party, as the case may be, that such violation has been remedied.

8.4 In the event the license granted hereunder is terminated in accordance with the provisions of paragraph 8.1, 8.2, or 8.3 hereof, REMCO may have 180 days to sell existing inventory of licensed products provided all compensation therefore accrued shall become due and payable immediately to TMP, and TMP shall not be obligated to reimburse REMCO for any advance royalty theretofore paid to TMP.

8.5 This Agreement shall terminate on July 1, 2032 unless otherwise agreed by the parties in writing. In the event this agreement is terminated pursuant to this paragraph 8.5, Remco shall receive a non-exclusive, royalty-free license from TMP of all trademarks of TMP licensed herein.

### ARTICLE IX - Force Majeure

9.1 In the event that it becomes impossible for REMCO to perform its obligation hereunder or to fully exploit the rights granted hereunder because of any event such as an Act of God, civil disorder, war, riot, fire, strike, government restrictions or other event beyond the control of REMCO, then REMCO's obligations hereunder shall be held in abeyance until the event(s) abates sufficiently to make performance or enjoyment of the rights

11

possible.   The performances required hereunder shall be extended for a period corresponding to the period of said event but in no event longer than four (4) months.

## ARTICLE X  -  Waiver, Modification, Etc.

10.1 No waiver, modification or cancellation of any term or condition of this Agreement shall be effective unless executed in writing by the party chargeable therewith.  No written waiver shall excuse the performance of any act other than those specifically referred to therein.  The parties make no warranties except those specifically expressed herein.

## ARTICLE XI  -  No Partnership, Etc.

11.1 This Agreement does not constitute and shall not be construed as constituting a partnership or joint venture between TMP and REMCO.  REMCO shall not have any right to obligate or bind TMP in any manner whatsoever, and nothing herein shall give or is intended to give any rights of any kind to any third persons, except as specified.

## ARTICLE XII  -  Non-Assignability

12

12.1 This Agreement shall bind and inure to the benefit of TMP, its successors and assigns, shall bind REMCO, its successors and assigns but shall not be assignable by REMCO apart from its general business assets.

## ARTICLE XIII - Construction

13.1 This Agreement shall be construed in accordance with the laws of the State of New York.

## ARTICLE XIV - Miscellaneous

14.1 All notices, consents and the like required to be given hereunder shall be deemed validly given if they are given in writing and sent by certified or registered mail as follows:

If to TMP:

Alan B. Amron
TALK TO ME PRODUCTS, INC.
P.O. Box 481
Syosset, New York 11791-0481

with a copy to:

Gerard F. Dunne, Esq.
645 Madison Avenue
11th Floor
New York, New York 10022

If to REMCO:

Mr. Marvin Azrak
Azrak-Hamway International, Inc.

13

1107 Broadway
New York, New York   10010

with a copy to:

Myron Fishbach, Esq.
Fishbach, Hertan & Reis
919 Third Avenue
New York, New York   10022

or such address as any party hereto shall have designated by notice
in writing to the other party hereto.

14.2 If any provision of this Agreement is for any reason
declared to be invalid, the validity of the remaining provisions
shall not be affected thereby.

14.3 This instrument contains the entire and only agreement
between the parties relating to the subject matter hereof.   Any
representation, promise or condition in connection with this
License Agreement not incorporated herein shall not be binding upon
either party.

14.4 No modification, renewal, extension or waiver or this
License Agreement or any of the provisions herein contained shall
be binding upon the party against whom enforcement of such
modification, renewal, extension or waiver is sought, unless made
in writing and signed on behalf of such party by one of its
officers or duly authorized representatives.

14

200116

rights to sell, exploit or in any way deal with or in any Article or any carton, container, packing or wrapping material, or advertising or promotional display material pertaining thereto, except with and under the special consent and instructions of Licensor in writing, which they shall be obligated to follow.

16. If Licensee shall fail to pay when due any and all payments required under this Agreement or fail to perform any of its other obligations under the terms of this Agreement or breaches any covenant contained or referred to in this Agreement, Licensor shall have the right to terminate the License hereby granted after thirty (30) days' notice in writing, during which period Licensee shall have the right to cure any such default as appropriate and satisfy Licensor that the failure of breach has been remedied.

17. Licensor warrants that it has the right to enter into this Agreement and license the Article to be utilized in connection with the Products in accordance with the provisions hereof and that Licensor indemnifies Licensee against all loss, cost and expense arising from breach of this representation or warranty.

18. Licensee may assign, transfer or sublicense this Agreement or any of its rights or obligations hereunder in connection herewith without the consent of Licensor to any affiliate, subsidiary or entity controlled by any of the principals of the Licensee.

19. All notices shall be made at the respective addresses of parties as set forth above by certified mail, return receipt requested, unless notification of change of address is given in writing and the date of mailing shall be deemed the date the notice or statement is received.

20. Nothing herein contained shall be construed to place the parties in a relationship of partners or joint venturers and Licensee shall have no power to obligate or bind Licensor in any manner whatsoever.

21. None of the terms of this Agreement can be waived or modified, except by an express agreement in writing signed by both of the parties. There are no representations, promises, warranties, covenants or undertakings other than those contained in this Agreement which represents the entire understanding of the parties. The failure of either party hereto to enforce or the delay by either party in enforcing any of its rights under this Agreement shall not be deemed a continuing waiver or modification thereof and either party may, within the time provided by applicable law, commence appropriate legal proceedings to enforce any or all such rights.

CONFIDENTIAL FOR
ATTORNEY'S EYES ONLY

-5-

200117

     22.  Licensee may not on its own, and in its own name, apply for any foreign patents.

     23.  This Agreement shall be binding upon the parties, their successors, heirs and permitted assigns.

     24.  In the event that any part or portion of this Agreement is declared invalid, illegal or unenforceable for any reason by a court of competent jurisdiction, such invalidity, illegality or unenforceability shall not affect any other terms or provisions of this Agreement.

     25.  This Agreement shall be construed in accordance with the laws of the State of New York and the parties consent to the jurisdiction of the courts of the State of New York.

     IN WITNESS WHEREOF, the parties hereto have hereunto set their hands and seals as of the day and year first above written.

                     AZRAK-HAMWAY INTERNATIONAL, INC.

By: _____
                 Ezra Hamway, President

TALK To ME Products, Inc.

by _____
ALAN AMRON,  PRES

CONFIDENTIAL FOR
ATTORNEY'S EYES ONLY

-6-

200118

## EXHIBIT A

## DESCRIPTION OF THE ARTICLE

DOUBLE-PUMP

Alan Amron has created the following invention:

To minimize pumping strokes and save time and energy, a more efficient and novel way to mechanically pump pressure into a holding chamber to be released with water for a continuous stream water gun.

Now there exists an air pump action continuous stream water gun called the Super Soaker. This hand-held water gun is hand pumped to get maximum pressure in a chamber for release of water under pressure. Amron's invention has a two-fold improvement.

A twice as efficient way to pump the same pressure into the holding chamber, therefore saving time and energy.

Now it takes approximately 20 to 40 pumps to fully pressurize the chamber for maximum shooting pressure of the water in the air chamber. By installing a check valve to allow air pumped into the chamber to only go in on front stroke, and in on out stroke, you cut down the amount of in and out strokes by 50%. By running a small tube from the end of the gun to the intake check valve in back of the gun, going into the air pressure chamber, you allow each stroke to give in take air for pressurization of the chamber.



CONFIDENTIAL FOR
ATTORNEY'S EYES ONLY

1

**9**

## LICENSE AGREEMENT

This Agreement is between **TALK TO ME PRODUCTS, INC.** having an office at 23 Green Street, Hempstead, New York 11743 (referred to hereinafter as "TMP"), and AZRAK-HAMWAY INTERNATIONAL, INC./REMCO having an office at 1107 Broadway, New York, New York 10010 (referred to hereinafter as "REMCO").

WHEREAS, TMP warrants that it possesses the entire right, title and interest to United States Letters Patent No. 4,239,129 granted on December 16, 1980 (hereinafter the "'129 Patent");

WHEREAS, REMCO has been marketing in the United States products falling within the scope of the '129 Patent and seeks to continue to market such products under license from TMP and to use the rights of TMP as further described in this Agreement;

WHEREAS, the parties hereto executed a license agreement effective March 13, 1992 and hereby desire to modify and correct said earlier-executed Agreement;

NOW, THEREFORE, in consideration of the mutual promises and covenants contained herein, the parties agree as follows:

## ARTICLE I - License Grant

1.1 Subject to the terms and conditions hereinafter set forth, and in consideration of the payments provided in Article II herein, TMP hereby grants and REMCO hereby accepts an

exclusive license under all the rights of TMP in the '129 Patent for all air-pressure waterguns falling within the scope of any claim of the '129 Patent. (hereinafter "Licensed Products"). The license allows REMCO to manufacture or have manufactured for it Licensed Products anywhere in the world for sale anywhere in the world.   The license granted to REMCO herein shall not include any right or permission to sublicense any of the rights acquired herein to any third parties without the prior written approval of TMP.

1.2   Notwithstanding paragaphs 1.1 above and 1.4 below, it is understood and agreed by the parties that TMP may grant a license to Larami Corp. of Philadelphia, Pennsylvania under the '129 Patent for all products of Larami Corp. presently sold under the SUPER SOAKER trademark.   TMP shall retain any royalty obtained from Larami Corp. for any license granted pursuant to this paragraph 1.2.

1.3   Notwithstanding paragraphs 1.1 above and 1.4 below, it is understood and agreed by the parties that TMP may grant a license to Arcotoys, Inc. of Westbury, New York under the '129 Patent for air-pressure water guns and twenty-five percent (25%) of all royalties received from any such license by TMP shall be paid within thirty (30) days of receipt to REMCO.

1.4   TMP hereby warrants and represents that it will not grant any further licenses for any technology under its ·ontrol for water guns operated by pressuring water in its reservoir without first providing the option to REMCO to obtain a license for such technology.   Prior to the execution of any

- 2 -   ROC022   CONFIDENTIAL

license by TMP to any other entity to license any technology involving water guns, TMP will identify the other entity and offer a license to REMCO under the same terms and conditions agreed upon by the other entity, and REMCO shall have thirty (30) calendar days to accept any such license agreement submitted to REMCO by March 15 of any calendar year or negotiate a license on different terms. For any such license agreement submitted to REMCO after March 15 of any calendar year, REMCO shall have until December 31 of that year to accept such license agreement or negotiate a license on different terms. In no event shall REMCO have less than thirty (30) calendar days to accept any such proposal. In the event of the failure of REMCO to accept the license agreement during such time period or obtain an agreement with TMP for different terms, TMP will be free to execute the license with the other entity.

1.5 Nothwithstanding the above, the parties understand that TMP has an outstanding offer to Hasbro, Inc. for the technology of hydraulic water guns described in application serial no. 767,244 filed in the United States Patent & Trademark Office on September 27, 1991 and serial no. 213,153 filed in the United States Patent and Trademark Office on December 23, 1991, and such technology shall not be subject to paragraph 1.4 above unless Hasbro, Inc. or any of its affiliated companies does not conclude a license with TMP for such technology by March 31, 1992. In the event that a license agreement for the technology



of the hydraulic water guns does not conclude with Hasbro, Inc. or any of its affiliated companies by March 31, 1992, such technology shall be subject to paragraph 1.4 above.

### ARTICLE II - License Payments and Royalty

2.1   REMCO agrees to pay TMP a continuing royalty of two percent (2%) of the net selling price received by REMCO for any Licensed Products sold in the United States, its territories and possessions irrespective of any other royalty paid by REMCO to TMP or any other entity regarding the sale of Licensed Products, except that credit shall be given to REMCO for the full amount of the advance royalties of paragraph 2.2 hereof.  No costs incurred for the manufacture, sale, promotion, import duties, brokerage fees or sales commissions of any of the Licensed Products shipped by REMCO shall be deducted from any payments due TMP under this Agreement; however, costs for paid sales taxes, discounts, returns and allowances may be deducted.

2.2   The parties acknowledge that REMCO has delivered to TMP a check in the amount of Twenty Thousand Dollars ($20,000) as a non-refundable advance for royalties due under paragraph 2.1 above, and such advance shall be credited against the continuing royalties due under paragraph 2.1 hereof.



CONFIDENTIAL

R00024

2.3 REMCO hereby agrees and warrants to use its best efforts to market Licensed Products in the Licensed Territory and elsewhere in order to maintain the exclusivity of the license granted in paragraph 1.1 above. Should REMCO fail to make sales of One Million Dollars ($1,000,000) of Licensed Products in the United States or its possessions and territories during any calender year, the grant in paragraph 1.1 shall become non-exclusive.

### ARTICLE III - Term

3.1 This Agreement shall remain in full force and effect for the term of the '129 Patent.

### ARTICLE IV - Records, Reports and Payments

4.1 Promptly on the 30th day following the end of each calendar quarter subsequent to the first shipment by REMCO of any product licensed under paragraph 1.1 above, REMCO shall furnish to TMP complete and accurate statements, certified by an officer of REMCO to be accurate, showing the number and description of all Licensed Products shipped during the preceding calendar quarter, together with all payments due TMP for such shipments. Such statements shall be furnished to TMP whether or not any of the Licensed Products have been shipped during the quarter. Receipt or acceptance by TMP of any of the statements furnished pursuant to this Agreement or of any sums paid hereunder shall

- 5 -

R00025 CONFID

not preclude TMP from questioning the correctness thereof for a period of three (3) years following receipt of said statement, and in the event that any inconsistencies or mistakes are discovered in such statements or payments in the favor of TMP, they shall immediately be rectified and the appropriate adjustments made.

4.2  REMCO agrees to keep accurate books of accounts and records covering all transactions relating to the license hereby granted, and TMP or its duly authorized representatives shall have the right, upon reasonable notice, at reasonable hours of the day, to examine said books of account and records and of all other documents and material in the possession or under the control of REMCO with respect to the subject matter and the terms of this Agreement, and shall have free and full access thereto for said purposes and for the purpose of making extracts therefrom.  TMP agrees that it will bear its own costs and expenses of such examination.  All books of account and records of REMCO shall be kept available for at least three (3) years after the end of each period covered by statements, and REMCO agrees to permit inspection thereof by TMP during such three (3) year periods.  However, REMCO need not permit more than one such examination in any calendar year.

4.3  All payments and reports hereunder shall be mailed to TMP by the required date at its address designated for notices hereunder.



- 6 -

## ARTICLE V - Indemnifications

5.1   REMCO shall notify TMP in writing of any
infringements by others of the '129 Patent which may come to the
attention of REMCO, and TMP shall take appropriate legal action,
including litigation, if appropriate, to remedy any such
infringements that produce substantial competition to REMCO for
any of the fifty (50) largest retail or wholesale accounts for
Licensed Products, and such action shall be at the sole expense
of TMP.   For all litigation commenced at the request of REMCO,
TMP shall retain 80% of the net proceeds of any such infringement
litigation after deduction for all expenses or legal fees
reasonably incurred by TMP in pursuing infringements of the '129
patent, and 20% of such net proceeds shall be paid within 30 days
to REMCO.   Should REMCO accept an invitation by TMP to join in
any such action, REMCO shall share in any recovery in the same
proportion as its contribution for the expenses of such action.
REMCO shall not institute any suit or take any action on account
of any infringements or imitations without first obtaining the
written consent of TMP to do so.   Provided, however, if TMP fails
to file a lawsuit against anyone infringing the rights licensed
herein within forty-five (45) days of receiving written
notification from REMCO of such infringement, REMCO shall have
the right to file a legal action against any such infringer at
its own expense, and TMP shall not share in any recovery unless

R&#x25E6;&#x25E6;027

CONFID

TMP accepts an invitation by REMCO to join in any such lawsuit. In such event, TMP shall share in any recovery in the same proportion for the expenses of such lawsuit.

5.2 REMCO hereby indemnifies TMP and undertakes to defend TMP against and hold TMP harmless from any claims, suits, loss or damage from a third party arising out of any allegedly unauthorized use of any patent, process, idea, method or device by REMCO in connection with products licensed in paragraph 1.1 above, other than those claims arising out of the '129 patent. REMCO shall also indemnify TMP and hold harmless from any and all Product Liability claims arising out of the manufacture, sale or use of the Licensed Products produced by REMCO under this Agreement. REMCO agrees to obtain, at its own cost and expense, product liability insurance providing adequate protection (but in no event shall the amount of this coverage be less than one million dollars) for TMP and itself against any such claims or suits arising from any alleged defects in products produced by REMCO under this Agreement.

5.3 TMP represents that it has no knowledge of any conflicting right of any third party with respect to the rights conveyed herein to REMCO and that it has no knowledge of any patent rights of any third party that would be infringed by REMCO's manufacture and sale of water guns using the structures disclosed in the '129 Patent (excluding the disclosed elements for producing light and sound).



- 8 -

5.4   TMP indemnifies REMCO and undertakes to defend REMCO against and hold REMCO harmless from any claims, suits, loss or damage from a third party arising out of any claims based on the '129 patent.

## ARTICLE VI - Patent Notice

6.1   REMCO shall cause to be imprinted irremovably and legibly, on each product manufactured, distributed or sold by or through them under this Agreement, or the packaging thereof, a statement that the product is licensed under the '129 Patent.

## ARTICLE VII - Product Samples

7.1   REMCO agrees to furnish TMP, free of cost, one dozen of each product covered by this Agreement together with all associated packaging before its sale.

## ARTICLE VIII - Specific Undertaking Of Licensee

During the term of the this Agreement, REMCO agrees that:

8.1   It will not attack the title of TMP to any of the rights conveyed herein, nor will it attack the validity of the License granted hereunder.

P. 029 [...]

- 9 -

8.2   It will not harm, misuse or bring into disrepute the rights of TMP granted herein.

8.3   It will manufacture, sell and distribute the products licensed under this Agreement in an ethical manner and in accordance with the terms and intent of this Agreement.

8.4   It will not create any expenses chargeable to TMP without prior written approval of TMP.

### ARTICLE IX - Termination

9.1 TMP shall have the right at its option to cancel this Agreement at any time REMCO has failed to make royalty payments as set forth in Article II.   If TMP elects to cancel this Agreement under this section 9.1 it shall give at least thirty (30) days written notice to REMCO, and REMCO may make the requisite royalty payments within such thirty (30) day period to prevent cancellation under this section 9.1.

9.2   In the event REMCO files a petition for bankruptcy or is adjudicated a bankrupt or if a petition in bankruptcy is filed against it or it becomes insolvent or makes an assignment for the benefit of its creditors or any arrangement pursuant to any bankruptcy law or if it discontinues its business or if a receiver is appointed for it or its business, the license granted hereunder, without notice, shall terminate automatically upon the

- 10 -

P... .030

occurrence of any such event. In the event the license granted hereunder is terminated under this paragraph 9.3, neither REMCO nor its receivers, representatives, trustee, agents, administrators, successors and/or assigns shall have any right to sell, exploit or in any way deal with or in any Licensed Product or any carton, container, packing or wrapping material, advertising, promotional or display material pertaining to any Licensed Product that had not been in inventory at the time a petition for bankruptcy is first filed.

9.3    If REMCO or TMP, as the case may be, shall violate any of its other obligations under the terms of this Agreement, which violation materially adversely affects the other party, the materially adversely affected party, as the case may, shall have the right to terminate the license hereby granted upon thirty (30) days notice in writing, and such notice of termination shall become effective unless the offending party shall completely remedy the violation within the thirty day period and satisfy the materially adversely affected party, as the case may be, that such violation has been remedied.

9.4    In the event the license granted hereunder is terminated in accordance with the provisions of paragraph 9.1, 9.2, or 9.3 hereof, all compensation therefore accrued shall become due and payable immediately to TMP, and TMP shall not be obligated to reimburse REMCO for any advance royalty theretofore paid to TMP.

## ARTICLE X - Force Majeure

This License Agreement shall be deemed terminated in the event that Governmental regulations or other causes arising out of a state of national emergency or war, or cause beyond the control of REMCO render performance impossible. In such event, all compensation due on sales theretofore made shall become immediately due and payable, and no advance royalty need be returned.

## ARTICLE XI - Waiver, Modification, Etc.

11.1 No waiver, modification or cancellation of any term or condition of this Agreement shall be effective unless executed in writing by the party chargeable therewith. No written waiver shall excuse the performance of any act other than those specifically referred to therein. The parties make no warranties except those specifically expressed herein.

## ARTICLE XII - No Partnership, Etc.

12.1 This Agreement does not constitute and shall not be construed as constituting a partnership or joint venture between TMP and REMCO. Neither party shall have any right to obligate or bind the other party in any manner whatsoever, and nothing herein shall give or is intended to give any rights of any kind to any third persons, except as specified.

- 12 - ROG032

### ARTICLE XIII - Non-Assignability

13.1 This Agreement shall bind and inure to the benefit of TMP, its successors and assigns, shall bind and inure to the benefit of REMCO, its successors and assigns but shall not be assignable by REMCO apart from its general business assets.

### ARTICLE XIV - Construction

14.1 This Agreement shall be construed in accordance with the laws of the State of New York.

### ARTICLE XV - Miscellaneous

15.1 All notices, consents and the like required to be given hereunder shall be deemed validly given if they are given in writing and sent by certified or registered mail as follows:

If to TMP:

Alan B. Amron
TALK TO ME PRODUCTS, INC.
P.O. Box 481
Syosset, New York 11791-0481

with a copy to:

Gerard F. Dunne, Esq.
645 Madison Avenue
5th Floor
New York, New York 10022



R℧ ⌷033

- 13 -

If to REMCO:

Marvin Azrak
Azrak-Hamway International, Inc.
1107 Broadway
New York, New York 10010

with a copy to:

Jesse Rothstein, Esq.
Amster, Rothstein & Ebenstein
90 Park Avenue
New York, New York 10016

or such address as any party hereto shall have designated by notice in writing to the other party hereto.

15.2   If any provision of this Agreement is for any reason declared to be invalid, the validity of the remaining provisions shall not be affected thereby.

15.3   This instrument contains the entire and only agreement between the parties relating to the subject matter hereof.  Any representation, promise or condition in connection with this License Agreement not incorporated herein shall not be binding upon either party.

15.4   No modification, renewal, extension or waiver of this License Agreement or any of the provisions herein contained shall be binding upon the party against whom enforcement of such modification, renewal, extension or waiver is sought, unless made in writing and signed on behalf of such party by one of its officers or duly authorized representatives.

R000034    CONFIDEN

### LICENSE AGREEMENT

200112

AGREEMENT made this _/_ day of _M.Hy_ , 1991, by and between TALK TO ME PRODUCTS INC., having an office at 23 Green Street, Huntington, New York 11743 (hereinafter collectively referred to as "Licensor"), and AZRAK-HAMWAY INTERNATIONAL, INC./REMCO, having its principal place of business at 1107 Broadway, New York, New York 10010 (hereinafter referred to as "Licensee").

### W I T N E S S E T H :

WHEREAS, Licensor represents that it is the owner of a lever pump air pressure water gun, as more particularly described in Exhibit A annexed hereto (hereinafter referred to as the "Article").

WHEREAS, Licensor has applied, at Licensor's sole cost and expense, for a United States patent for the Article.

WHEREAS, Licensor warrants that it has the sole and exclusive right to enter this License and has not conveyed any rights herein pertaining to the Article to any other person or entity [except to Arco Toys, Inc. ("Arco")].

WHEREAS, Licensee is in the business, among other things, of manufacturing, selling and distributing toys.

WHEREAS, Licensee desires to obtain the sole and exclusive right to manufacture, sell, promote and distribute the Article throughout the world (except for Arco).

NOW, THEREFORE, it is agreed as follows:

1. Except as hereinafter specifically provided, Licensor hereby sells, transfers and licenses to Licensee, the exclusive right to manufacture, sell, promote and distribute the Article and any accessories and games in connection with the Article throughout the world pursuant to the terms of this Agreement. In no event may Licensor license or allow the use of the Article in conjunction with any item to be manufactured by anyone other than the Licensee (except for Arco).

CONFIDENTIAL FOR
ATTORNEY'S EYES ONLY



DEFENDANT'S
EXHIBIT
D 15-2

200111

arising out of any defect of any nature in any Product, and agrees to carry products liability coverage for domestic sales. Licensor shall give the Licensee reasonable notice of any claim indemnified against hereunder and the Licensee shall have the right to conduct the defense of such claim with counsel of its choosing, provided it diligently proceeds to do so at its own cost and expense. Said insurance shall be issued by a reputable company. A certificate of insurance shall be submitted to Licensor within thirty (30) days of the date of this Agreement which shall contain a provision that it shall not be cancelled without prior written notice to Licensor. The minimum amounts of said insurance shall be $1,000,000.00.

9.    Licensor shall indemnify and hold the Licensee and its officers, directors, employees, representatives and agents harmless against any and all settlements, judgments, damages, loss, costs and expenses (including but not limited to attorneys' fees) incurred by Licensee in connection with any claims and/or actions of actual or alleged copyright, patent or trademark infringement or any other proprietary rights in connection with the Article and/or Products in accordance with this Agreement or by virtue of any other exercise by Licensee of its rights under this Agreement, or incurred by Licensee in connection with any breach by Licensor of any of its representations or warranties hereunder. Licensee shall give the Licensor reasonable notice of any claim indemnified against hereunder and the Licensor shall have the right to conduct the defense of such claim with counsel of its choosing, provided it diligently proceeds to do so.

This indemnity shall be limited to those claims which arise from rights of others which existed as of the date hereof and those, if any, which may arise from rights of others which are perfected within six (6) months from the date hereof (irrespective of when any of such rights are asserted).

10.    All recoveries obtained by Licensor in the event of any claim against third parties for infringement of the Article or like action will be shared ~~equally~~ between Licensor and Licensee ~~after first deducting costs and expenses incurred in connection with any such proceed~~ing.

11.    On the 30th day of the month following the calendar quarter, Licensee shall furnish to Licensor complete and accurate statements certified to be accurate by Licensee showing the number and gross sales price, itemized deductions from gross sales price and net sales price of the Products sold and distributed by the Licensee. Such statement shall be furnished to Licensor whether or not Products have been sold during the calendar quarter. Simultaneously, with each submission of the Royalty reports, as described herein, Licensee shall pay to Licensor any and all sums that may be due pursuant to the terms and conditions of this Agree-

-3-


CONFIDENTIAL FOR
ATTORNEY S EYES ONLY

200115

ment after receiving appropriate credit for any advanced Royalties made by Licensee to Licensor hereunder. The acceptance by Licensor of the Royalty statements and Royalties do not preclude Licensor from questioning the correctness thereof. To that end, Licensor, upon written notice, may inspect the books and records of Licensee and make extracts therefrom for the purpose of verifying the information contained therein. Licensee agrees to keep full and accurate books of account, records, data and memoranda respecting the manufacture and sales of the Products in sufficient detail to enable the payments hereunder to Licensor to be determined, and Licensee further gives Licensor the right to examine said books and records insofar as they concern the Products, but not more often than once in any twelve (12) month period, for the purpose of verifying the reports provided for in this Agreement. In the event that such inspection reveals a discrepancy in the amount of Royalty due Licensor from what is actually paid, Licensee shall immediately pay such discrepancy to Licensor.

12. Licensee will display the statement "LICENSED UNDER AMRON PATENT PENDING" on all of its packaging and molds, until such time as the patent number is issued and at that time the notice of "AMRON (patent number)" will be displayed.

13. Licensee agrees that the Products shall be of a standard consistent with that of the trade. Six (6) samples shall be submitted to Licensor for approval and Licensor shall approve or disapprove any such sample within three (3) days of submission. Any sample not so approved shall be deemed approved.

14. It is agreed by and between the parties that provided Licensee has paid all Royalties due, submitted all periodic statements, and is otherwise not in default of the terms of this Agreement, then the parties agree that for a period of one hundred eighty (180) days following the termination of expiration of the term of this License, Licensee shall have the right to sell or otherwise dispose of, all of the Products on hand or in the process of being manufactured provided that Licensee agrees to pay the Royalty payments as required herein and to provide Licensor with any and necessary periodic statements.

15. If a petition in bankruptcy is filed by or against Licensee or if Licensee becomes insolvent or makes an assignment for the benefit of its creditors or an arrangement pursuant to any bankruptcy law, or if Licensee discontinues its business or if a receiver is appointed for it or its business, to the fullest extent permitted by law at the time of the occurrence, the License hereby granted shall automatically terminate forthwith without any notice whatsoever being necessary. In the event this License is so terminated, Licensee, its receivers, representatives, trustees, agents, administrators, successors and/or assignees shall have no

-4-



CONFIDENTIAL FOR ATTORNEY'S EYES ONLY

**10**

# Remco's Super Pump Water Guns Do Infringe the '129 Patent







**'129 Patent**      **Remco One Pump**

## CLAIM 1

A toy comprising an elongated housing having a chamber therein for a liquid, a pump including a piston having an exposed rod end extending rearwardly of said toy facilitating manual operation for building up an appreiable amount of pressure in said chamber for ejecting a stream of liquid therefrom an appreciable distance substantially forwardly of said toy, and means for controlling the ejection.

| | '129 Patent | Remco One Pump |
|---|---|---|
| An elongated housing having a chamber therein for a liquid? | YES | YES |
| A pump including a piston having an exposed rod end extending rearwardly? | YES | YES |

## CLAIM 10

, toy simulating a pistol comprising wall structure forming an elongated barrel of appreciable cross-section dimensions, a tank in the barrel for a liquid and a hollow handle, a cylinder disposed axially in said tank and provided with a check valve, a piston mounted in said cylinder for manual reciprocation for pumping air into said tank, conduit means connected to said tank and having an outlet located at the front of said barrel, valve means interposed in said conduit means, and a trigger operable independently of said piston carried by said handle for operating said valve means for controlling the forced flow of liquid through said outlet.

| | | |
|---|---|---|
| An elongated barrel of appreciable cross section dimensions? | YES | YES |
| A tank in the barrel? | YES | YES |
| A cylinder disposed axielly in said tank? | YES | YES |
| A trigger ... carried by said handle? | YES | YES |

## CLAIM 11

The toy defined in claim 10, including a nozzle connected to said outlet for adjusting the direction of the liquid expelled therefrom.

| | | |
|---|---|---|
| Including a nozzle connected to said outlet for adjusting the direction of the liquid expelled therefrom? | YES | YES |



**LARGE CAPACITY WATER TANK**

**SLIDE KNOB**

**FILL CAP**
(NEVER UNSCREW FILL CAP WHILE JUMBO WATER TANK IS PRESSURIZED.)

**DIRECTIONAL KNOB**
THE SHOOTING DIRECTION CAN BE ADJUSTED BY MOVING THE DIRECTIONAL KNOB TO THE LEFT OR RIGHT

**TRIGGER**

**NON PERFOR**

*SUPER PUMP*
SHOOTS



CLAIM 1   A toy comprising an elongated housing having a
chamber therein for a liquid, a pump including a piston
having an exposed rod end extending rearwardly of said
toy facilitating manual operation for building up an
appreiable amount of pressure in said chamber for
ejecting a stream of liquid therefrom an appreciable
distance substantially forwardly of said toy, and means
for controlling the ejection.

CLAIM 10   A toy simulating a pistol comprising wall structure
forming an elongated barrel of appreciable cross-
section dimensions, a tank in the barrel for a liquid
and a hollow handle, a cylinder disposed axially in
said tank and provided with a check valve, a piston
mounted in said cylinder for manual reciprocation for
pumping air into said tank, conduit means connected
to said tank and having an outlet located at the front
of said barrel, valve means interposed in said conduit
means, and a  trigger operable independently of said
piston carried by said handle for operating said valve
means for controlling the forced flow of liquid through
said outlet.

CLAIM 11   The toy defined in claim 10, including a nozzle
connected to said outlet for adjusting the direction
of the liquid expelled therefrom.



## AIR PRESSURE QUEST® BLASTER

### JONNY QUEST
#### The Real Adventures™

**LARGE CAPACITY WATER TANK**

**SLIDE KNOB**

**FILL CAP**
( NEVER UNSCREW FILL CAP WHILE JUMBO WATER TANK IS PRESSURIZED.)

**DIRECTIONAL KNOB**
THE SHOOTING DIRECTION CAN BE ADJUSTED BY MOVING THE DIRECTIONAL KNOB TO THE LEFT OR RIGHT

**TRIGGER**

**NON-SLIP HAND GRIP**

**SUPER PUMP™**
**SHOOTS**
UP TO

| | |
|---|---|
| DOESN'T SHOOT FAR | • NOT ENOUGH W IN TANK<br>• MORE PUMPING |
| NEEDS CONSTANT PUMPING TO SHOOT | • TIGHTEN FILL C |
| GUN SHOOTS POORLY OR DOESN'T SHOOT AT ALL | • NEED MORE WA TANK (SEE INST 1 TO FILL TANK<br>• NOZZLE CLOGG FLUSH NOZZLE<br>• MORE PUMPING<br>• CHANGE WATER (REFILL WITH C FRESH WATER) |

### SAFETY HINTS

1. NEVER SHOOT ANYONE IN THE OR EYES.
2. USE ONLY CLEAN WATER.
3. NEVER FILL WITH OR SHOOT OTHER LIQUIDS.
4. BEFORE REMOVING FILL CAP PRESS TRIGGER UNTIL ALL P IS RELEASED.
5. NEVER UNSCREW FILL CAP W JUMBO WATER TANK IS PRES

**PERFORMANCE CHART FOR JONN SUPER PUMP™ SP 200**

| NUMBER OF | WATER |
|---|---|

**11**

0  50163 16073  8

© 1992 REMCO TOYS INC. N.Y.,N.Y. 10010
MADE IN CHINA

LICENSED UNDER AMRON PATENT PENDING
& #4,239,129

**ITEM # 16073**

**12**

LEVITTOWN KMART 3979

PLEASE RETAIN RECEIPTS FOR RETURNS AND
EXCHANGES  90 DAY RETURN POLICY

| | | | |
|---|---|---|---|
| 1 | 050163161445 | WATER GUN | 4.99 |
| 2 | 050163161445 | WATER GUN | 4.99 |
| 3 | 050163161438 | WATERGUN SET | 4.99 |
| 4 | 04467402 | HABISOD | 2.99 N |
| 5 | 016000679702 | CEREAL | 3.79 N |
| 6 | 016000679702 | CEREAL | 3.79 N |

| | |
|---|---|
| SUBTOTAL | 25.54 |
| TAX | 1.27 |
| TOTAL | 26.81 |
| AM EXPRESS CHARGE TENDER | 26.81 |
| CHANGE | .00 |

4826-4826 137 03 03/17/97 3979 06:16P

**13**



**14**

*Paul Eisenstein*

*Counselor at Law*

*7600 Jericho Turnpike*
*Woodbury, New York 11797*

*516-496-2828*
*Fax # 516-496-8450*

March 19, 1997

**VIA FACSIMILE NO. 212-286-0082**

Jesse Rothstein, Esq.
Amster, Rothstein & Ebenstein, Esqs.
90 Park Avenue
New York, New York 10016

Re:  Amron and Azrak-Hamway

Dear Jesse:

In accordance with our telephone conversation of today I enclose
herewith a copy of the Assignment from Talk To Me Products Inc. to
Alan Amron dated February 12, 1997.

Very truly yours

PAUL EISENSTEIN

PE:mtb
Enclosure

| FORM PTO-1595<br>1-31-92 | RECORDATION FORM COVER SHEET<br>**PATENTS ONLY** | U.S. DEPARTMENT OF COMMERCE<br>Patent and Trademark Office |

Tab settings ⇨ ⇨ ⇨ ▼            ▼            ▼            ▼            ▼            ▼            ▼

To the Honorable Commissioner of Patents and Trademarks: Please record the attached original documents or copy thereof.

**1. Name of conveying party(ies):**

Talk To Me Products, Inc.

Additional name(s) of conveying party(ies) attached? ☐ Yes ☒ No

**3. Nature of conveyance:**

☒ Assignment                    ☐ Merger

☐ Security Agreement            ☐ Change of Name

☐ Other _____

Execution Date: __February 12, 1997__

**2. Name and address of receiving party(ies):**

Name: __Alan Amron__

Internal Address: _____

Street Address: __77 Horton Place__

City: __Syosset__          State: __N Y__ ZIP: __11791__

Additional name(s) & address(es) attached? ☐ Yes ☒ No

**4. Application number(s) or patent number(s):**

If this document is being filed together with a new application, the execution date of the application is: _____

A. Patent Application No.(s)

(B.) Patent No.(s)

Patent Number #4,239,129

Additional numbers attached? ☐ Yes ☒ No

**5. Name and address of party to whom correspondence concerning document should be mailed:**

Name: __Alan Amron__

Internal Address: _____

Street Address: __77 Horton Place__

City: __Syosset__          State: __N Y__ ZIP: __11791__

**6. Total number of applications and patents involved:** | 1 |

**7. Total fee (37 CFR 3.41):** ................. $ __40.00__

☒ Enclosed

☐ Authorized to be charged to deposit account

**8. Deposit account number:**

_____

(Attach duplicate copy of this page if paying by deposit account)

DO NOT USE THIS SPACE

**9. Statement and signature.**

To the best of my knowledge and belief, the foregoing information is true and correct and any attached copy is a true copy of the original document.

__Alan Amron__                              February 12, 1997
Name of Person Signing          Signature          Date

Total number of pages comprising cover sheet: | 1 |